DA 09-0463

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 38

IN THE MATTER OF THE FAIR HEARING OF

JEWELL HANNA

CFSD CAPS RR #189612,

      Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADV 08-599
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Terrence L. Toavs, Law Offices of Terrance L. Toavs; Wolf Point, Montana

      For Appellee:

            Michelle J. Maltese, Special Assistant Attorney General; Helena, Montana

Submitted on Briefs:  January 13, 2010

Decided:  February 23, 2010

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Jewel Hanna appeals the decision and order of the District Court for the First Judicial District, Lewis and Clark County, ruling that the Child and Family Services Division (CFSD) of the Department of Public Health and Human Services (DPHHS) had jurisdiction to issue a report substantiating child abuse and neglect by Hanna.

¶2    The sole issue on appeal is whether the District Court erred in concluding that CFSD had jurisdiction, or the power to exercise its authority, to substantiate child abuse and neglect by Hanna.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    This case arises from the failed placement of M.S., an Indian child, in the foster care of Jewel Hanna, an enrolled member of the Fort Peck Indian Tribes.  At all times relevant to this case, Hanna has resided in Poplar, Montana, within the external boundaries of the Fort Peck Indian Reservation.

¶4    M.S. was born in Minnesota and was in foster case since birth.  The State of Minnesota had terminated the parental rights of M.S.'s birth parents and assumed legal custody.  Pursuant to the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963 (2006), a central policy of which is to promote placement of Indian children removed from their families in foster and adoptive homes that reflect Indian values and culture, Minnesota sought to place M.S. with Hanna, who is M.S.'s great aunt.

¶5    Because Minnesota sought to place M.S. in a foster home in Montana, the Interstate Compact on the Placement of Children (ICPC) governed.  Section 41-4-101,

art. III, MCA. As DPHHS administers Montana's obligations as a receiving state under ICPC, § 41-4-104, MCA, DPHHS had to approve the foster placement, § 41-4-104, art. III(4), MCA. After conducting a home study and background investigation, DPHHS approved placing M.S. with Hanna. In July 2004 DPHHS licensed Hanna as a kinship foster care provider under § 52-2-662, MCA, and Rule 37.51.202, Admin. R. M. A month later, DPHHS placed the child with her great aunt.

¶6 Despite the general prohibition of state interference with tribal affairs, DPHHS, a state agency, placed M.S., an Indian child, with Hanna, an enrolled member living on the Fort Peck Indian Reservation, under the auspices of a Memorandum of Agreement (MOA) between the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation (Tribes), the Bureau of Indian Affairs (BIA), and the State (DPHHS). The MOA, it turns out, is the linchpin of CFSD's claim for jurisdiction.

¶7 M.S.'s placement with Hanna was short-lived. In March 2005 staff at the daycare where Hanna would leave M.S. when she went to work reported their suspicion that M.S. was suffering abuse. Upon receiving the report of abuse, CFSD took physical custody of M.S., placing the child in a temporary foster home off the reservation, in Miles City. Subsequently M.S. was sent to Minnesota, which state retained legal custody. Minnesota later consented to M.S.'s adoption.

¶8 Contemporaneous with M.S.'s removal, CFSD, along with BIA and a tribal criminal investigator, initiated an investigation into the cause of the alleged abuse. They concluded that Hanna had abused M.S., and in May 2005 CFSD issued a substantiated

report of abuse and neglect to Hanna. The report informed Hanna of the adverse effects that CFSD's substantiation determination would have on her ability to obtain work in fields regulated by DPHHS.

¶9 Within one month of receiving the substantiated report, Hanna sought a fair hearing under Rule 37.47.610, Admin. R. M., to contest the determination. Under Rule 37.47.615, Admin. R. M. (which contains exceptions to the right to a fair hearing under Rule 37.47.610, Admin. R. M.), a person subject to a substantiated report of child abuse is not entitled to a fair hearing if she has been convicted of an offense related to child abuse. CFSD did not begin the fair hearing process for Hanna until 2007, since the investigation had not led to criminal charges.

¶10 After CFSD initiated the procedures for the fair hearing, Hanna moved to dismiss the substantiation proceeding on jurisdictional grounds. Hanna argued that under the Fort Peck Comprehensive Code of Justice (CCOJ), the Tribes maintained exclusive jurisdiction over matters involving Indian youth and that CFSD's substantiation proceeding interfered with tribal sovereignty. The hearing officer of DPHHS adopted this argument and dismissed the substantiation proceeding.

¶11 CFSD appealed the hearing officer's decision to the District Court pursuant to the Montana Administrative Procedure Act (MAPA), § 2-4-702(1)(a), MCA. There, CFSD argued that pursuant to the MOA, it had jurisdiction to issue the substantiated report against Hanna under state law and policy because it had licensed Hanna as a kinship foster care provider in the first place. CFSD maintained that the CCOJ did not apply

4

because its relevant provisions merely focused on the welfare of children and did not address substantiation determinations, which focus on the abuser (here, Hanna). This argument persuaded the District Court, which reversed the hearing officer's decision.

¶12 Hanna timely appealed the District Court's decision.

## STANDARD OF REVIEW

¶13 Resolution of this case turns on the question of subject matter jurisdiction. This is a question of law, which we review de novo. *See Bugger v. McGough*, 2006 MT 248, ¶ 19, 334 Mont. 77, 144 P.3d 802.

## DISCUSSION

¶14 ***Whether the District Court erred in concluding that CFSD had jurisdiction to substantiate child abuse and neglect by Hanna.***

¶15 Hanna's principal argument is that CFSD lacks jurisdiction to pursue a substantiation proceeding against an enrolled tribal member, like Hanna, for acts committed on the reservation against an Indian child. We disagree.

¶16 Our discussion begins with the sovereign rights of the Fort Peck Indian Tribes. Tribes, as "domestic dependent nations," exercise "inherent sovereign authority over their members and territories"; that is, tribes may make laws to govern their internal affairs and social relations. *Zempel v. Liberty*, 2006 MT 220, ¶ 20, 333 Mont. 417, 143 P.3d 123 (quoting *Okla. Tax Commn. v. Potawatomi Tribe*, 498 U.S. 505, 509, 111 S. Ct. 905, 909 (1991)). Tribes are, however, subject to the "plenary and exclusive" authority of the United States Congress. *United States v. Lara*, 541 U.S. 193, 200, 124 S. Ct. 1628, 1633

(2004). With roots in the so-called Indian Commerce Clause and the Treaty Clause, U.S. Const., art. I, § 8, cl. 3; art. II, § 2, cl. 2, this congressional authority, along with tribes' recognized right of self-government, has traditionally operated to exclude state authority, or jurisdiction, over Indian affairs. *Lara*, 541 U.S. at 200, 124 S. Ct. at 1633; *White Mt. Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S. Ct. 2578, 2583 (1980); *Worcester v. Georgia*, 31 U.S. 515, 561 (1832); *but see Nevada v. Hicks*, 533 U.S. 353, 361-62 n. 4, 121 S. Ct. 2304, 2311 n. 4 (2001) (suggesting, in dicta, limitation on holding from *Worcester*).

¶17    This Court has acknowledged this general limitation, that "[t]he exercise of state jurisdiction over activities occurring entirely on Indian lands is an infringement on inherent tribal authority and is contrary to principles of self-government and tribal sovereignty." *Flat Ctr. Farms, Inc. v. State*, 2002 MT 140, ¶ 13, 310 Mont. 206, 49 P.3d 578; *cf. First v. State*, 247 Mont. 465, 471, 808 P.2d 467, 470 (1991) (ruling that State may exercise jurisdiction over tribal members within reservations if such exercise is not preempted by Congress and does not interfere with tribal sovereignty). Despite this general prohibition against state jurisdiction over Indian affairs, states and tribes may, with congressional approval, enter into cooperative agreements altering the scope of jurisdiction on reservations. *See Native Village of Stevens v. Smith*, 770 F.2d 1486, 1489 (9th Cir. 1985) (explaining that 42 U.S.C. § 1919(a) authorizes tribal-state cooperative agreements regarding child care); *cf. Kinnerly v. Dist. Ct. of the Ninth Jud. Dist. of Mont.*,

6

400 U.S. 423, 423-30, 91 S. Ct. 480, 480-84 (1971) (ruling that tribe could not grant state jurisdiction over tribal affairs absent congressional authorization).

¶18　Here, CFSD points to the Memorandum of Agreement between the Tribes and DPHHS (and BIA) as the federally-authorized cooperative agreement that is the basis for its jurisdiction to maintain the substantiation determination. To evaluate this position, we must consider first whether the MOA enjoys congressional authorization, and second whether the MOA allows CFSD to pursue a substantiation proceeding against Hanna.

¶19　The purpose of the MOA is to allow eligible Indian children on the Fort Peck Indian Reservation to receive services and foster care maintenance payments from CFSD (or BIA). Under the MOA, CFSD was to provide care and services to Indian children eligible for funding under the foster care program of Title IV-E of the Social Security Act, 42 U.S.C. §§ 670-679c (2006).[1] The Tribes, CFSD, and BIA entered into the MOA under the authority of the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 (2006). Under § 1919(a) of ICWA, tribes and states:

> are authorized to enter into agreements with each other respecting care and custody of Indian children and jurisdiction over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction

---

[1] Title IV-E creates a foster care program of "cooperative federalism" in which states may choose to participate. *Native Village of Stevens*, 770 F.2d at 1487-88. Participating states create and operate foster care and adoption programs that conform to federal requirements, and in exchange the federal government reimburses states for their expenditures. 42 U.S.C. §§ 671(a), 674(a). Until 2008, Tribes had to enter into agreements with states to receive Title IV-E funding. Barbara Ann Atwood, *Wells Conference on Adoption Law: Achieving Permanency for American Indian and Alaska Native Children: Lessons from Tribal Traditions*, 37 Cap. U. L. Rev. 239, 252 n. 64 (2008). The Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110-351, §§ 301-302, 122 Stat. 3949, 3962-73 (2008), now allows tribes to enjoy the same direct access to Title IV-E funding as states do.

on a case-by-case basis and agreements which provide for concurrent jurisdiction between States and Indian tribes.

This language is sufficiently broad to include agreements between tribes and states that grant state agencies jurisdiction to administer Title IV-E foster care programs and to make foster care maintenance payments to Indian children on Indian reservations. *See Native Village of Stevens*, 770 F.2d at 1489-90 (holding that § 1919(a) does not require states to enter agreements with tribes, but suggesting that § 1919(a) allows tribes and states to enter agreements regarding Title IV-E foster care programs and payments). Accordingly, we conclude that the MOA is a valid, federally-authorized agreement.

¶20 Hanna objects to this conclusion, arguing that while § 1919(a) may authorize states and tribes to enter agreements "respecting care and custody of Indian children and jurisdiction over child custody proceedings," it does not allow agreements that deprive tribal courts of jurisdiction to adjudicate the rights of accused abusers. We reject this argument. The substantiation proceeding, which is an adjudication of Hanna's rights, *Dowell v. Mont. Dept. of Pub. Health & Human Servs.*, 2006 MT 55, ¶¶ 15-16, 20, 331 Mont. 305, 132 P.3d 520, arose directly from Hanna's "care" of an Indian child, M.S. As such, it fits within the language of § 1919(a). Such investigation and verification of alleged child abuse and neglect are necessary components of an effective foster care program. *See e.g.* 42 U.S.C. § 671(a)(9)-(10) (requiring approved state foster care programs to provide for reporting of child abuse and to establish standards for foster homes). Furthermore, as we see below, CFSD's authority to pursue the substantiation proceeding conforms with the grant of jurisdiction from the MOA.

8

¶21 Accordingly, we turn to the second consideration: whether the MOA authorizes CFSD to pursue a substantiation proceeding against Hanna for her alleged abuse of M.S. We conclude that it does.

¶22 The relevant language of the MOA is plain on its face. Part X of the MOA addresses licensing of foster homes. Paragraph B of Part X reads, "The Tribes and BIA will recognize the CFSD license of a foster home when the home has a current license issued by CFSD." Paragraph C of Part X then provides:

> The agency that licensed a home, upon receipt of a referral regarding violation of foster home licensing standards, will conduct an investigation to determine compliance with governing licensing standards, statute/tribal code and policy. The final decision concerning licensing status will remain with the agency that issued the license.

Paragraph E of Part X adds:

> When CFSD and BIA receive a referral on a licensed foster home alleging child abuse or neglect, the report shall be investigated by the placing agency and the agency that issued the license and follow the requirements of the Indian Child Protection Act (25 USC 3203) where appropriate.

¶23 These provisions demonstrate that DPHHS, the agency that licensed Hanna here, is responsible for investigating allegations of abuse and neglect, documenting the conclusions of such investigation in a final report, and making the final decision about Hanna's licensing status. By the terms of Paragraph E, upon receipt of an allegation of abuse and neglect by Hanna, CFSD (the relevant section of DPHHS) was required to conduct an investigation. Under 25 U.S.C. § 3203(b)-(c) of the Indian Child Protection Act (cited in Paragraph E), this investigation was to lead to a final written report (here, the substantiated report). Following the final written report, under Paragraph C, CFSD

9

was required to make a final decision about Hanna's licensing status. Where the parties to the MOA wanted the Tribes' Comprehensive Code of Justice to apply or the Fort Peck Tribal Court to have jurisdiction, they expressly so stated. *See* MOA, pt. III, ¶ G; pt. V, ¶ B. The MOA does not contemplate tribal jurisdiction with regard to investigations of and reports on child abuse and neglect, and final licensing decisions brought by state agencies under Part X. For this reason, we hold that the CFSD had jurisdiction under the terms of the MOA to pursue the present substantiation proceeding against Hanna under state laws and regulations. We therefore affirm the ruling of the District Court.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ PATRICIA O. COTTER

10