*533 OPINION AND ORDER
¶1 Following its inquiry into the complaint filed against Leroy Not Afraid (Not Afraid) by appointed prosecuting attorney, Geoffrey R. Keller (Keller), the Judicial Standards Commission (JSC) filed its recommendation with this Court. The JSC recommends that Not Afraid be sanctioned for violating the Montana Constitution and the Code of Judicial Conduct by a public reprimand and the imposition of proceeding costs. Not Afraid objects to the recommendation and requests dismissal of the complaint. Keller has responded to Not Afraid’s objections. We conclude that the complaint must be dismissed. We state the dispositive issue as follows:
p2 Is the office of Crow Tribal Chairman an “elective public office” for Purposes of Article VII, Section 10?
I FACTUAL AND PROCEDURAL BACKGROUND
■[3 Not Afraid was duly elected Justice of the Peace for Big Horn Bounty in November 2006, and he began his term of office on January ., 2007. Pursuant to Article III, Section 3 of the Montana Constitution ind §3-10-202, MCA, he took the constitutional oath of office before ssuming his duties.
[4 Not Afraid is an enrolled member of the Crow Tribe of Indians. In larch 2009, Not Afraid filed as a candidate for the office of Crow 'ribal Chairman while maintaining his office as Justice of the Peace, ’he Crow Constitution and Law and Order Code define the Chairperson as an executive position. Crow Const, art. IV, §1; Crow nw & Order Code. tit. 21, art. Ill, § 1(1) (2005). The JSC sent two ¡tters to Not Afraid and his attorney, advising Not Afraid of the ■revision of Article VII, Section 10 of the Montana Constitution ftquiring a holder of a judicial position to forfeit that position upon ■ling for a non-judicial elective public office. Not Afraid did not forfeit Hs position and campaigned for the tribal office. Not Afraid advanced fcer the primary tribal election held on March 28, 2009, but he was B)t elected Tribal Chairman in the general tribal election held on April *534 18, 2009. In December 2009, Keller filed a complaint[1] against Not Afraid alleging violations of Article VII, Section 10 as well as Rules 1.1, 1.2, and 3.1 of the 2008 Montana Code of Judicial Conduct.[2]
¶5 Not Afraid sought dismissal of the complaint on the grounds that the JSC lacked jurisdiction; violated his Crow constitutional rights federal supremacy, Montana law, Crow tribal sovereignty and triba law; and improperly interpreted “elective public office.” Not Afraid argued that the alleged violations of the Code of Judicial Conduct were illusory because of the erroneous application of Article VII, Section 10
¶6 In March 2010, the JSC denied Not Afraid’s motion to dismiss concluding that Article VII, Section 10 and the Code of Judicia Conduct applies to Not Afraid for his actions as Justice of the Peace and that the Crow Tribal Chairman position is included within th< common definition of an “elective public office.” The JSC furthei determined that the Code of Judicial Conduct would serve as ai independent basis for sanctions against Not Afraid which would not b mooted by the completion of the tribal election.
¶7 Ahearing on the complaint was held on June 25,2010. Not Afraii testified about state offices he had resigned upon his election as Justic of the Peace, and about the counsel he had sought and receive* regarding the necessity of resigning his Crow legislative seat. H testified that, based upon this advice, it was his belief that he was n< required to resign his Crow legislative seat, and that he was also fr *535 to pursue election as Crow Chairman while maintaining his state judicial position. After hearing, the JSC concluded that Not Afraid violated Article VII, Section 10, as well as Rules 1.1,1.2, and 3.1 of the Code of Judicial Conduct. The JSC viewed the advice against resignation which Not Afraid had received as a mitigating factor and recommended to this Court that Not Afraid be publicly reprimanded instead of forfeiting his office, and that he pay the costs of the proceeding.[3] The JSC indicated that a subsequent violation of this nature by Not Afraid would result in its pursuit of Not Afraid’s immediate suspension from his judicial position. Not Afraid filed objections to the JSC’s recommendations, renewing his argument that the JSC had no legal authority and had erred by denying his motion to dismiss. This Court requested and received a response from Keller to Not Afraid’s objections.
STANDARD OF REVIEW
¶8 We review the Judicial Standard Commission’s proceedings de novo. Harris v. Smartt, 2002 MT 239, ¶ 36, 311 Mont. 507, 57 P.3d 58, vacated on other grounds, 2003 MT 135, 316 Mont. 130, 68 P.3d 889. The JSC’s recommendations are not binding on this Court. Harris, ¶ 36.
DISCUSSION
¶9 As a preliminary matter, we address Not Afraid’s broadly-stated arguments challenging jurisdiction. Not Afraid argues that the ‘imposition of Article VII, Section 10 of the Montana Constitution upon [him] constituted a violation of and interference with the Crow Constitution[] and Crow sovereignty ....’’First, though not specifically raised by Not Afraid, it is clear that Not Afraid cannot raise the lefense of sovereign immunity. Indian tribes, and tribal officials acting n their official tribal capacity, have sovereign immunity from suit in state courts unless Congress authorized the suit or the tribe has mequivocally waived its immunity. Thompson v. Crow Tribe of Indians, 1998 MT 161, ¶¶ 15, 17, 23, 289 Mont. 358, 962 P.2d 577. lowever, individual tribal members can be sued for personally Hdolating state law, regardless of whether the tribe itself is determined Ho be immune from suit. Puyallup Tribe, Inc. v. Dept. of Game of *536 Wash., 433 U.S. 165, 171-72, 97 S. Ct. 2616, 2621 (1977). Not Afraid has been subjected to this proceeding for his individual acts, so he cannot personally raise the defense of sovereign immunity.
¶10 Subject matter jurisdiction pertains to the fundamental power of a court to hear and decide a case. Pinnow v. Mont. St. Fund, 2007 MT 332, ¶ 16, 340 Mont. 217, 172 P.3d 1273. The issue of subject matter jurisdiction can be raised at any time. Wippert v. Blackfeet Tribe of the Blackfeet Indian Reservation, 260 Mont. 93, 102, 859 P.2d 420, 425 (1993). While state and tribal jurisdiction is complex, certain principles have consistently been recognized. ‘Essentially, absent governing Acts of Congress, the question has always been whether the state action: infringed on the right of reservation Indians to make their own laws and be ruled by them.” Williams v. Lee, 358 U.S. 217, 220, 79 S. Ct. 269, 271 (1959). Additionally, ‘ttjhe cases in this Court have consistently guarded the authority of Indian governments over thei: reservations.” Williams, 358 U.S. at 223, 79 S. Ct. at 272. Tb jurisdictional tests employed by this Court have recognized thes foundational principles. See White Mountain Apache Tribe v. Bracker. 448 U.S. 136, 142, 100 S. Ct. 2578, 2583 (1980) (quoting Williams fo: the second prong of its test); First v. State Dept. of Soc. & Rehab. Servs., 247 Mont. 465, 471, 808 P.2d 467, 470 (1991) (adopting tb White Mountain Apache test in Montana); State ex rel. Iron Bear v. Dist. Ct., 162 Mont. 335, 339-40, 346, 512 P.2d 1292, 1295-96, 1299 (1973) (adopting a three-part test based, in part, on Williams); see also In re Marriage of Skillen, 1998 MT 43, ¶¶ 42-47, 287 Mont. 399, 956 P.2d 1 (differentiating between and clarifying the White Mountan Apache and Iron Bear tests). This Court has recognized trib sovereignty and the right of tribal self-government. See Skillen, ¶ 4 (citing In re Custody of Zier, 230 Mont. 464, 750 P.2d 1083 (1988); In re Marriage of Limpy, 195 Mont. 314, 636 P.2d 266 (1981); State ex rel Stewart v. Dist. Ct., 187 Mont. 209, 609 P.2d 290 (1980)).
¶11 We have also acknowledged that, generally, “‘[tjhe exercise state jurisdiction over activities occurring entirely on Indian lands i| an infringement on inherent tribal authority and is contrary principles of self-government and tribal sovereignty.’ ” Matter Hanna, 2010 MT 38, ¶ 17, 355 Mont. 236, 227 P.3d 596 (quoting Fla Ctr. Farms, Inc. v. State Dept. of Revenue, 2002 MT 140, ¶ 13, 31 Mont. 206, 49 P.3d 578). However, when substantial activities occur Oj the reservation, the state may generally assume jurisdiction. Matte of Bertelson, 189 Mont. 524, 531, 617 P.2d 121, 125 (1980) (citatio: omitted); see also Little Horn State Bank v. Stops, 170 Mont. 510, 51 *537 555 P.2d 211, 214 (1976); Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49, 93 S. Ct. 1267, 1270 (1973) (citations omitted). Montana courts have jurisdiction over a tribal member whose actions involve “ ‘significant contacts with the state outside reservation boundaries.’ ” Balyeat Law, PC v. Pettit, 1998 MT 252, ¶ 38, 291 Mont. 196, 967 P.2d 398 (quoting Crawford v. Roy, 176 Mont. 227, 230, 577 P.2d 392, 393 (1978)).
¶12 We disagree with Not Afraid’s contention that the JSC is attempting to regulate ‘lndian[s] running for tribal office.” The state has made no effort to regulate candidates for tribal office. The Crow Tribe may qualify its own candidates and conduct its own elections. Here, the state is seeking to enforce the qualifications for a state office which was sought and obtained by an individual Crow tribal member. Not Afraid’s actions, in filing and running for state office, involved much more than “significant contacts with the state.” He became a state official and took a constitutional oath of office to support, protect, and defend the Montana Constitution. Therefore, the state is not impermissibly interfering with tribal sovereignty or self-governance, and has jurisdiction to pursue the complaint against Not Afraid.
¶13 Is the office of Crow Tribal Chairman an “elective public office”for purposes of Article VII, Section 10?
¶14 Article VII, Section 10 of the Montana Constitution states that ‘ta]ny holder of a judicial position forfeits that position by either filing for an elective public office other than a judicial position or absenting himself from the state for more than 60 consecutive days.” (Emphasis added.) Not Afraid argues that the definition of “elective public office” in the constitution and in statute does not include elective tribal offices, and thus he did not violate the provision by filing as a candidate for tribal office. He argues that Keller failed to establish that a "public” office includes an office filled by qualified tribal members voting in an election on their own reservation. Evidence introduced at the hearing indicated that the number of votes cast in the Crow ■Chairman primary election was about 3,500, and the number of votes ■past in the Crow Chairman general election was approximately 3,400. ■Keller responds that “elective public office” includes the Crow Chairmanship because the position is defined as an executive office in Che Crow Constitution, is elected by a public vote of eligible voters, and Boreign authority has held that tribal council members are “elected public officials.”
■115 ‘The same rules of construction apply in determining the meaning IBf constitutional provisions as apply to statutory [construction.” Keller v. Smith, 170 Mont. 399, 404, 553 P.2d 1002, 1006 (1976) (citations *538 omitted). “In determining the meaning of a given provision, the intent of the framers is controlling.” Keller, 170 Mont. at 405, 553 P.2d at 1006 (citations omitted). ‘Such intent shall first be determined from the plain meaning of the words used, if possible, and if the intent can be so determined, the courts may not go further and apply any other means of interpretation.” Keller, 170 Mont. at 405, 553 P.2d at 1006 (citations omitted). If the language itself is not clear, “we must resort to extrinsic rules of construction.” Keller, 170 Mont. at 406, 553 P.2d at 1007.
¶16 Using this framework as a guide, we first look at the words of the constitution. Constitutional language should be given its natural or ordinary meaning. Gen. Agric. Corp. v. Moore, 166 Mont. 510, 516, 534 P.2d 859, 863 (1975) (citations omitted). However, the language of Article VII, Section 10 does not indicate whether the term “public office” includes only offices of the state or would include the offices of another sovereign. The provision does not reference tribal offices. It| provides no guidance regarding what constitutes a “public” office, as opposed to an office elected by a group whose membership is narrower] than the general public.
¶17 ‘The rule is that when the framers’ intent cannot be determined] from the Constitution’s plain words, recourse may be had to tb proceedings of the Constitutional Convention.” State ex rel. Racicot v. Dist. Ct., 243 Mont. 379, 386-87, 794 P.2d 1180, 1184 (1990) (citatio: omitted). Unfortunately, our constitutional history offers little help i: discerning the intent of this provision. The explanatory notes of tb 1972 Constitutional Convention regarding Article VII, Section 10 state, in their entirety: ‘New provision. A judge may not run for any othe: public office, or be out of the state for more than 60 days.” Tb Convention transcripts include comments by the delegates that thi; provision would prohibit a judge from “filing for any other office durini his term of office.” Montana Constitutional Convention, Verbati: Transcript, February 29,1972, p. 1120 (emphasis added). The purpose was ‘to prevent what we think is political ambition” and preven “using the courts as stepping-stones in fulfillment of a politica] ambition,” and the tone of the discussion revealed an understanding that “any office” meant any ‘political office.” Montana Constitutional] Convention, Verbatim Transcript, February 29, 1972, p. 1120. Agai: there is no particular guidance with regard to the application of thj provision to tribal offices.
¶18 We may also consult the Legislature’s determination constitutional intent. “While such determination is not binding on thi] Court, it is entitled to consideration.” Keller, 170 Mont. at 407, 55 *539 P.2d at 1007. The Attorney General has opined that §§3-1-607 and 3-1-608, MCA, are implementing statutes for Article VII, Section 10. Mont. Atty. Gen. Op. 21, 44 Op. Atty. Gen. Mont. 21 at *4 (Oct. 22, 1991).[4] Section 3-1-607(1), MCA states:
Supreme court justice or district court judge candidacy for nonjudicial office-resignation required. (1) If a person occupying the office of chief justice or associate justice of the supreme court or judge of a district court of the state of Montana becomes a candidate for election to any elective office under the laws of the state of Montana other than a judicial position, the person shall immediately, or in any event at or before the time when the person is required to file as a candidate for the office in any primary, special, or general election, resign from the office of chief justice, associate justice, or district court judge.
This provision requires a judge to resign from his office upon becoming ‘a candidate for election to any elective office under the laws of the state of Montana ....’’Section 3-1-607(1), MCA (emphasis added). This anguage applies the prohibition to only those offices governed by state aw and thus excludes tribal offices, which are created and governed )y tribal law. Keller correctly notes that this provision does not include ustices of the peace, addressing only district court judges and supreme :ourt justices. We acknowledged the same in regard to the predecessor ersion of the statute in Committee for an Effective Judiciary v. State, 209 Mont. 105, 679 P.2d 1223 (1984), noting that the statute revent[s] only district judges and supreme court justices from eeking other judicial office without forfeiting their office.” Comm. for n Effective Jud., 209 Mont. at 113, 679 P.2d at 1227. However, we iso explained that the prohibition as stated in Article VII, Section 10 broader than the statute in this regard, as it “applies to all judges in .is state.” Comm. for an Effective Jud., 209 Mont. at 113, 679 P.2d at 227.[5] Thus, the Constitution reaches justices of the peace though the atute does not. We look to the statute here only for its guidance on e meaning of “public office.”
*540 ¶19 Not Afraid notes that tribal offices are not mentioned with the other offices included within the definition of “public office” provided by the election statutes, and he urges that we make the same distinction. Section 13-1-101(28), MCA, provides that “‘[plublic office’ means a state, county, municipal, school, or other district office that is filled by the people at an election,” and tribal offices are notably missing from this listing. There is also legislative history regarding the election statutes which supports Not Afraid’s position. In 2003, the Legislature considered a bill to generally revise the election code. The sponsor proposed an amendment which was eventually adopted anc is currently codified at §13-10-201(1), MCA: “A candidate may not file for more than one public office....” During the discussion of thi provision, Rep. Windy Boy asked the sponsor if he, as a tribal member would be affected by the rule against running for two position! simultaneously. Mont. H. State Admin. Comm., Minutes of the Hearing on H. Bill 190, 58th Legis., Reg. Sess. 3 (Jan. 29, 2003). Rep. Wind; Boy was also a Chippewa-Cree Tribal Councilman. In response, th sponsor stated that the proposed statute would not affect Rep. Wind; Boy because “tribal government is sovereign.” Mont. H. State Admin Comm., Minutes of the Hearing on H. Bill 190, at 3.
¶20 Keller argues that this definition of "public office” should h restricted to Title 13 of the MCA and not applied to issues arisin under the Montana Constitution or the Code of Judicial Conduct. Hi notes that § 13-1-101, MCA, states “[a]s used in this title, unless th context clearly indicates otherwise, the following definitions apply... We have held, however, that “when a word is defined in the code, th: definition is applicable to other parts of the code except where t contrary is plainly indicated.” SJL of Mont. Assocs. Ltd. Partn. v. Cit of Billings, 263 Mont. 142, 147, 867 P.2d 1084, 1087 (1993) (citing § 2-107, MCA; Dept. of Revenue v. Gallatin Outpatient Clinic, 234 Mon 425, 430, 763 P.2d 1128, 1131 (1988)). We see no clear indication th the statutory definition of “public office” cannot be referenced fc issues arising outside of Title 13.
¶21 This Court has previously addressed the issue of what constituí a ‘^public office.” We have noted that “ £[t]he American concept of public office is that of a public trust or agency created for the bene: of the people, and in which the incumbent has not a property right, be administered under legislative control in the interest of t] people.’ ” State ex rel. Hollibaugh v. State Fish & Game Commn., 1 Mont. 384, 390, 365 P.2d 942, 946 (1961) (quoting State ex rel. Nag v. Sullivan, 98 Mont. 425, 437, 40 P.2d 995, 997-98 (1935)). In For Second Legislative Assembly v. Lennon, 156 Mont. 416, 481 P.2d 3 *541 (1971), we were called upon to determine whether delegates to the constitutional convention were ‘“state officer[s]’ holding a public office of a civil nature” for purposes of the constitutional prohibition on holding more than one office. In doing so, we articulated the following standards for resolving the question:
After an exhaustive examination of the authorities, we hold that five elements are indispensable in any position of public employment, in order to make it a public office of a civil nature: (1) It must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the Legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the Legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power, other than the law, unless they may be those of an inferior or subordinate office, created or authorized by the legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity and not be only temporary or occasional.
Forty-Second Legis. Assembly, 156 Mont. at 422-23, 481 P.2d at 333-34 (quoting State ex rel. Barney v. Hawkins, 79 Mont. 506, 528-29, 257 P. 411, 418 (1927)). We have explained that if any one of the five elements is missing, then the particular position is considered employment, and not a public office. State ex rel. Running v. Jacobson, 140 Mont. 221, 225, 370 P.2d 483, 485 (1962).
nI22 Applying the above test, the position of Crow Tribal Chairman is pot created by the Montana Constitution nor by the Legislature, so element (1) is not satisfied. The powers and duties of Crow Tribal Chairman are not directly or impliedly defined by the Montana Legislature, thereby negating element (3). At least two elements would pot be satisfied. While this test may not have been designed for the particular issue before us, it nonetheless provides guidance with regard to the factors we have considered to be significant in deciding Jhe contours of a “public office.”
1123 Keller’s argument emphasizes the following language from Committee for an Effective Judiciary:
The judicial article is clearly the most restrictive-it imposes severe sanctions on office-seeking by judicial office holders. Any judge holding office in this state forfeits his office if he files for any office-other than a judicial position.” (Art. VII, Section 10, *542 supra.)
Comm. for an Effective Jud., 209 Mont. at 115, 679 P.2d at 1228. This language is concededly broad, indicating that a judge who files for “any office” forfeits his judicial position. It could be considered dictum, given that the issue in that case was the Legislature’s prohibition on judges filing for other judicial offices. Perhaps more important, for the purposes of this case, is the incongruity between this statement and the language of Article VII, Section 10. The constitutional prohibition extends, not to “any office,” but to an “elective public office,” and the opinion in Committee for an Effective Judiciary provided no analysis of this phrase. Rather, it focused on the phrase “other than a judicial position” within Article VII, Section 10: ‘The language, ‘other than a judicial position,’ shows that the delegates intentionally left the door open for judicial office holders to file for other judicial office without forfeiting their offices as a condition to seeking other judicial office through the election process.” Comm. for an Effective Jud., 209 Mont. at 115, 679 P.2d at 1228. Thus, we do not believe the language quoted above from Committee for an Effective Judiciary determines the issue before us today-whether “elective public office”includes tribal offices. ¶24 Keller also offers Confederated Tribes of the Siletz Indians of Oregon v. Employment Department, 995 P.2d 580 (Or. App. 2000) which, in part, determined whether Siletz Indian tribal counci’ members were “elected public officials” under Oregon statutes. In] Confederated Tribes, an unemployment compensation dispute aros when three members of the Siletz tribal council were removed fro office and claimed unemployment benefits. Confederated Tribes, 995 P.2d at 582. The Siletz tribe had previously elected to be subject t Oregon’s employment statutes. Confederated Tribes, 995 P.2d at 582 The Tribe argued the former tribal council members should b considered “elected public officials,” under a statute, rendering the: ineligible for unemployment coverage. Confederated Tribes, 995 P.2d at 584-85. After analyzing the statutory text, statutory context, an legislative history, the court concluded that the language excludin coverage for elected public officials was intended only to apply to stat| and local government employees-not to any other category of electe public officials such as tribal officials-and awarded unemploymen benefits to the former council members. Confederated Tribes, 995 P.2 at 585-89. Keller argues that “authority exists” to conclude the Cro chairmanship is an elective public office, relying on the Oregon Court| comment that, under a dictionary definition, “the ordinary meaning the term ‘elected public official’ would appear to include Siletz’s tribj council members.” Confederated Tribes, 995 P.2d at 585. However, tl *543 holding in the Oregon case was actually the opposite. Consequently, we do not find Confederated Tribes persuasive.
¶25 We acknowledge there is little authority to assist in deciding this question. However, it is clear that nothing within the constitutional language, the delegates’ statements, statutory provisions, legislative history or case precedent reveals any indication to include tribal offices within the concept of “elective public office” under Montana law. All indications point to the opposite conclusion-that tribal offices are creations of another sovereign and not considered public offices of the state. Here, the office of the Crow chairmanship was created by the Crow Tribe and only tribal members are eligible to run for or to vote for the position. Members of the Montana public at large are not.
¶26 Therefore, we conclude that the phrase “elective public office” in Article VII, Section 10, of the Montana Constitution does not include the tribal office of Crow Tribal Chairman. Consequently, Not Afraid did not violate this provision by becoming a candidate for election as Crow Tribal Chairman. Because Not Afraid was not in violation of Article VII, Section 10, we also conclude that he was not in violation of Rules 1.1,1.2, or 3.1 of the Montana Code of Judicial Conduct. We further order that each party is responsible for its own legal costs and fees.
¶27 The complaint against Not Afraid is dismissed.
DATED this 30th day of December, 2010.
JUSTICES LEAPHART, COTTER, WHEAT and MORRIS concur.

 Pursuant to authority granted by Article VII, Section 11(2) of the Monta Constitution and by §3-1-1105(2), MCA, the JSC adopted Rule 10(b), which provide! fa] complaint shall not be a prerequisite to action by the Commission. The Commissioj may act on its own motion ... where the Commission considers it appropriate.’Tn State ex rel. Smartt v. Jud. Stands. Commn., 2002 MT 148, 310 Mont. 295, 50 P.3d 150, stated in ¶ 30 that Tw]e see nothing in Rule 10(b) that prevents the Commission fro j carrying out its constitutional duty to investigate complaints from Montana citizen” and nothing in the Montana Constitution that bars the Commission from acting on ifi own motion to investigate willful misconduct in office, persistent failure to perforf judicial duties and violations of the canons of judicial ethics. We conclude that t| Commission did not exceed its jurisdiction in... undertaking its own investigation of t| [] allegations.”

 Article VII, Section 10 states: “Any holder of a judicial position forfeits th| position by either filing for an elective public office other than a judicial position j absenting himself from the state for more than 60 consecutive days.”
Rule 1.1 provides: “Compliance with the Law A judge shall comply with the la including the Code of Judicial Conduct.
Rule 1.2 states: “Promoting Confidence in the Judiciary A judge shall act at j times in a manner that promotes public confidence in the independence, integrity, t impartiality of the judiciary, and shall avoid impropriety and the appearance| impropriety.”
Rule 3.1 provides: “Extrajudicial Activities in General A judge may engagej extrajudicial activities, except as prohibited by law or this Code....”

 The JSC’s recommendation for the imposition of costs upon Not Afraid is mtrary to our holding in Harris v. Smartt, 2003 MT 135, ¶ 17, 316 Mont. 130, 68 P.3d 89.

 It is not necessary to address, and we take no position on, the opinions expressed tthin the referenced Attorney General’s opinion, which focused on a different issue, j e simply review the statutes for the broader purpose of gleaning constitutional intent.

 The Court in Committee for an Effective Judiciary declared the predecessor Irsions of § 3-1-607 and 608, MCA, to be unconstitutional. Comm. for an Effective Id., 209 Mont. at 115, 679 P.2d at 1229. The Legislature subsequently amended §3-1-|7, MCA, to comply with the decision.