Justice Beth Baker, dissenting.
***485 ¶ 84 I agree that the Department overstepped its executive authority when it adopted Rule 1 because the enabling legislation did not trump existing statutory limitations on an agency's rulemaking authority. Section 2-4-305(6), MCA. Rule 1 conflicts with § 15-30-3111, MCA, and was an ultra vires act by the Department. I do not join the Court's Opinion, however, because, in my view, the Court oversteps its own authority in invalidating § 15-30-3111, MCA (the Tax Credit Program), as unconstitutional.
¶ 85 Cases that test the limits of the government's involvement in matters of religion are difficult, in no small part because of the constitutional tension between prohibited government establishment of religion and the restraint against government action interfering with its free exercise. The Montana Constitutional Convention Delegates, seeking to avoid "jeopardiz[ing] the precarious historical balance which has been struck between opposing doctrines and countervailing principles," Montana Constitutional Convention, Committee Proposals, Feb. 22, 1972, p. 728, preserved the 1889 State Constitution's protection against direct or indirect public funding for sectarian purposes. As the Court accurately observes, other than stylistic changes, the Delegates maintained the language, and thus the meaning, of the 1889 Constitution when they adopted Article X, Section 6. Opinion, ¶¶ 21, 25.[1] The Court today seeks to outline a logical framework for examining claimed violations of Article X, Section 6, of the Montana Constitution. But it does not adhere to controlling principles of law in analyzing § 15-30-3111, MCA, and Rule 1 within that framework.
¶ 86 The Court begins with a fundamental mistake that permeates the remainder of the Opinion and flaws its conclusions. Relying in part on the title of Section 6, the Court makes a sweeping statement that the provision broadly prohibits "aid" to sectarian schools. Opinion, ¶ 19. Recognizing the first principle of statutory construction-to examine the plain meaning of the words used, Opinion, ¶ 18-it nonetheless ***486 skips over the words used in Section 6 to divine the Delegates' intent. Throughout the Opinion, the Court then applies its broad construct of "aid" to draw conclusions on each element within its outlined framework.
¶ 87 Let's back up a step. Article X, Section 6, says that the government "shall not make any direct or indirect appropriation or payment from any public fund or monies , or any grant of lands or other property for any sectarian purpose or to aid any church, ... or other ... institution, controlled in whole or in part by any church, sect, or denomination." (Emphasis added). In purporting to identify the "three main inquiries" required in its analysis, the Court applies the sweeping term "aid" instead of the textual "appropriation or payment from any public fund or monies." Opinion, ¶ 20. As an established *626 principle of statutory construction, we do not rely on a provision's title over the language contained within its text. Bates v. Neva , 2014 MT 336, ¶ 21, 377 Mont. 350, 339 P.3d 1265 (recognizing that titles "are subordinate to statutory text and cannot be used to create ambiguity"). The operative language in the text is "direct or indirect appropriation or payment from any public fund or monies." Without examining what that language plainly means, the Court employs a broad meaning of "aid" for its analysis.[2] I begin with the plain language.
¶ 88 Article X, Section 6(1) prohibits four actions:
(1) direct appropriations;
(2) indirect appropriations;
(3) direct payments; or
(4) indirect payments
from public funds or monies. The first step is to examine what is an "appropriation" and what is a "payment." "A long line of Montana cases has established that 'appropriation' refers only to the authority given to the legislature to expend money from the state treasury." Nicholson , 265 Mont. at 415, 877 P.2d at 491. We discussed the nature of state appropriations in Dixon , explaining:
"Appropriation" means an authority from the law-making body in legal form to apply sums of money out of that which may be in the treasury in a given year, to specified objects or demands against the state. It means the setting apart of a portion of the public ***487 funds for a public purpose, and there must be money in the fund applicable to the designated purpose to constitute an appropriation.[3]
Dixon , 59 Mont. at 78, 195 P. at 845.
¶ 89 A "payment" is the "[p]erformance of an obligation by the delivery of money or some other valuable thing...." Payment , Black's Law Dictionary (10th ed. 2014). The Constitution likewise extends this prohibition to "any grant of lands or other property"-other items of value that the government must own, or be entitled to, before it can effectuate a delivery to another. Article X, Section 6, using the disjunctive "or," distinguishes an "appropriation" from a "payment." As discussed above, an appropriation comes "from the law-making body" or the "legislature" to "expend" or "apply" money "from the state treasury." Nicholson , 265 Mont. at 415, 877 P.2d at 491 ; Dixon , 59 Mont. at 78, 195 P. at 845. A "payment," in contrast, is attenuated from the law-making body. The Legislature cannot "appropriate" funds "to any private individual, private association, or private corporation not under control of the state." Mont. Const. art. V, § 11 (5). "Payments" are made by the Executive Branch carrying out its appropriated spending authority, for example, by spending on contracts or by awarding grants.
¶ 90 For illustrative purposes, using the SSO Program as an example, the plain language of Article X, Section 6, would apply to the following:
1. Direct Appropriation: the Legislature appropriates $3 million to QEPs as defined in the statute, including religious schools;
2. Indirect Appropriation: the Legislature appropriates $3 million to SSOs, *627 which then award the funds to QEPs, including religious schools;
3. Direct Payment: (a) the Office of Public Instruction (OPI) implements a grant program to award grants from its general ***488 fund budget to QEPs, including religious schools, or contracts with religious schools to hire teachers, or (b) the State Land Board donates a section of state trust land to a QEP on which to build a religious school;
4. Indirect Payment: (a) OPI grants funds to SSOs to provide teachers to religious schools, or (b) the State Land Board donates a section of state trust land to an SSO, which then auctions the land to support QEPs, including religious schools, or conveys the land for a sectarian school building site.
¶ 91 There is little dispute that the Tax Credit Program's tax credit does not constitute a direct appropriation or payment. The Department argues instead that the District Court erred by failing to consider the indirect impact that targeted tax breaks have on the public fisc. It emphasizes that the tax breaks indirectly aid sectarian schools. This argument becomes the lynchpin for the Court's holding. The argument may be correct, as far as it goes. But a theory based upon "indirect impacts" or "indirect effects" of the Tax Credit Program diverges from the constitutional text. Unambiguous constitutional language must be given its plain, natural, and ordinary meaning. See Nelson , ¶ 16 ; Judicial Standards Comm'n v. Not Afraid , 2010 MT 285, ¶ 16, 358 Mont. 532, 245 P.3d 1116.
¶ 92 In this regard, "we have long adhered to ordinary rules of grammar" in construing statutes. Bates , ¶ 15 (internal quotations omitted); see also Jay v. Sch. Dist. No. 1 of Cascade Cty. , 24 Mont. 219, 224-25, 61 P. 250, 252 (1900) (stating that "we must elicit the purpose and intent of [a statute] from the terms and expressions employed, if this is possible; calling to our aid the ordinary rules of grammar. This is the elementary rule applicable to all statutes. Other rules may be invoked only when this fails."). As the Court observes, the same principles of statutory construction apply when we interpret constitutional provisions. Opinion, ¶ 18. To invalidate the statute on the basis that it indirectly impacts sectarian schools to the detriment of the public fisc violates ordinary rules of grammar, as it requires reading "indirect" to modify "aid" rather than "appropriation or payment." The clause, "any direct or indirect appropriation or payment from any public funds or monies ... for any sectarian purpose or to aid any" sectarian institutions, contains at least two modifiers of "appropriation or payment." The first, "direct or indirect," modifies the parallel terms "appropriation or payment." It thus prohibits any appropriations or payments, whether direct or indirect. What follows are non-parallel prepositional phrases, which describe from where these appropriations or payments may not be taken-"any public fund ***489 or monies"-and for what these appropriations or payments may not be used-"any sectarian purpose" or "to aid" sectarian institutions. The sentence structure means that "direct or indirect" modifies "appropriation or payment," and does not modify the non-parallel phrases "from public funds or monies" or "to aid any" sectarian school.[4]
¶ 93 The funds at issue pass from donor to SSO to student-selected school; they are accounted for in the public fisc by virtue of the dollar-for-dollar offset. Tax Credit , Black's Law Dictionary (10th ed. 2014) (defining tax credit as "[a]n amount subtracted directly from one's total tax liability, dollar for dollar ..."). Although this may be an indirect transfer of benefit to the student-selected school, the word "indirect," by itself, does not impose a prohibition upon all tax policies merely because they have that indirect effect. Rather, "indirect" modifies the subject of the clause, which is the "payment." Thus, the provision prohibits government agencies *628 from making payments from a public fund or monies to religious schools indirectly. In this case, the funds eligible for tax credits are not "payment from any public fund or monies." The creation of the credit is a government's determination not to collect tax revenues. The statute diverts the funds before they ever become public monies. This well may result in an indirect impact on the "public fund or monies," but it is not an indirect payment.
¶ 94 Under the Tax Credit Program, the funds originate with private donors and are donated to the SSOs, which in turn direct the funds to the student's chosen school as a credit toward the student's obligation. No money originates, is deposited into, or is expended from the state treasury or any public fund. The State never takes "title" to the donated money or otherwise possesses it.
¶ 95 When this Court struck the property tax levy for private schools in Chambers , it was careful to distinguish its holding from property tax exemptions for religious institutions that had been upheld by the U.S. Supreme Court in Walz . See Chambers , 155 Mont. at 431-32, 472 P.2d at 1018. This was so even though the 1889 Constitution, under which Chambers was decided, contained the same prohibition on payments "from any public fund or moneys whatever" in aid of religious schools, ***490 whether directly or indirectly, as in the 1972 Constitution. 1889 Mont. Const. art. XI, § 8.
¶ 96 The concern about "indirect payments" that undergirded the Delegates' decision to re-adopt the subject provisions in the 1972 Constitution was the possibility that government would appropriate funding for religious schools through intermediaries, necessitating retention of the language prohibiting "indirect" payments. "[I]t would be fairly easy to appropriate a number of funds and then-to [sic] some other group and then say this will be done indirectly." Montana Constitutional Convention, Verbatim Transcript, March 11, 1972, p. 2015 (Delegate Blaylock); see also Direct payment , Black's Law Dictionary (10th ed. 2014) (defining "direct payment" as a "payment made directly to the payee, without using an intermediary ..."). The Constitutional Convention was held one year after this Court had decided Montana State Welfare Board v. Lutheran Social Services , 156 Mont. 381, 480 P.2d 181 (1971) -in which we rejected the State Welfare Board's argument that payment of medical benefits to a woman using a religiously affiliated adoption agency would violate the Constitution-and two years after this Court's decision in Chambers , in which we distinguished property tax exemptions from impermissible property tax levies in support of religious schools. Delegate Loendorf, sponsor of the proposal to retain the "indirect" language that the Convention ultimately adopted, stated that, under his proposal, the provision "will continue to mean and do whatever it does now," expressing an apparent desire to preserve the status quo so recently stated by this Court. Montana Constitutional Convention, Verbatim Transcript, March 11, 1972, p. 2014. Beyond indirect payments, the delegates did not discuss tax credits or deductions for private donations to religious schools.
¶ 97 The Convention debates on Article X, Section 6, thus reflect an intention that is consistent with the plain language the Delegates ultimately adopted. For this reason, the Court's reliance on Nelson to divine a broader meaning is misplaced. The Constitutional Convention record we examined in Nelson directly discussed the issue before the Court-the retention of common-law privileges-and contained thorough consideration explaining the Delegates' intention that such privileges would survive the broad language of the public's right to know in Article II, Section 9. Nelson , ¶¶ 20-21. Here, in contrast, the Convention transcript contains zero discussion of the use of, or prohibition against, tax incentives to encourage donations to private schools. The transcripts thus do not "clearly manifest an intent not apparent from the express language." Nelson , ¶ 16. Rather, as the ***491 Court acknowledges, the transcripts demonstrate the Delegates' desire to maintain the 1889 status quo.
¶ 98 Turning its focus to the specific provisions of § 15-30-3111, MCA, the Court strikes the statute in its entirety as unconstitutional. Opinion, ¶¶ 39-40. The Court concludes that the statute is facially invalid. But *629 it does not properly address the difference between a facial and an as-applied challenge, important here because the Court's analysis-and its rationale for striking the statute-employs a strictly as-applied theory.
¶ 99 A party bringing a facial challenge "must show that no set of circumstances exists under which the statute would be valid or that the statute lacks any plainly legitimate sweep." In re S.M. , 2017 MT 244, ¶ 10, 389 Mont. 28, 403 P.3d 324 (internal quotations omitted). We presume that a statute is constitutional, unless the Court is convinced beyond a reasonable doubt that the statute conflicts with the constitution. Mont. Cannabis Indus. Ass'n , ¶ 12. Any doubt must be resolved in favor of upholding the statute. Mont. Cannabis Indus. Ass'n , ¶ 12. Importantly, the party challenging the constitutionality of a statute bears the burden of proof. Mont. Cannabis Indus. Ass'n , ¶ 12. The Court mentions the heightened standard that a facial challenge brings, but falls short of actually analyzing the statute under this standard. Conceivably, the statute would not be applied unconstitutionally if a student chose to apply her scholarship to a non-sectarian private school. In such a case, the tax credits offered under the statute would not offend Article X, Section 6. The Court dismisses any such constitutional applications because the statute contains "no mechanism" for the Department to determine whether the money will be used to indirectly pay tuition at sectarian schools. Opinion, ¶ 36. This conclusion is problematic for at least two reasons. First, no one-not even the Department-argued that every application of the statute was unconstitutional under Article X, Section 6. Rather, the Department instituted Rule 1 to prohibit what it saw as unconstitutional applications of the statute, while still allowing what it saw as constitutional applications to continue to utilize the Tax Credit Program. Second, the Court's holding transforms almost any as-applied challenge into a facial challenge; challenged statutes rarely have a built-in mechanism to sift out unconstitutional applications. The Court notably ignores the statute's severability clause until after it already has thrown out the entire Tax Credit Program.
¶ 100 The Court's heavy reliance on Chambers , e.g. , Opinion, ¶ 36, fails because that case involved payment from public monies to hire teachers at a parochial high school-a plain violation of the prohibition ***492 against "direct appropriations." Even though the teachers were to give "a standard course of instruction" at the sectarian school, the public school district had no control over the parochial school, and "it of necessity must supplement these courses of instruction by those required by the doctrines of the Church." Chambers , 155 Mont. at 437, 472 P.2d at 1020-21. Citing a Roman Catholic Encyclical, the Court pointed out that every subject taught must "be permeated with Christian piety." Chambers , 155 Mont. at 437-38, 472 P.2d at 1021. It was in this context-public payment of teacher salaries-that the Court concluded the lines between secular and sectarian purposes were impermissibly blurred. The case sheds no light on whether Tax Credit Program at issue is facially invalid simply because the Department does not examine how a taxpayer's contributions are used.
¶ 101 In rejecting any valid application of the statute, the Court's singular focus is on the Fiscal Note to Senate Bill 410. The Court relies on the Fiscal Note to conclude that many donors claiming the tax credit also would be parents who send their children to QEPs. Opinion, ¶ 32. It cites the Fiscal Note to demonstrate "the fact that the Legislature indirectly pays tuition to the QEP." Opinion, ¶ 33 (emphasis added). And it cites the Fiscal Note in holding that the Tax Credit Program "creates an indirect payment" by reducing "the net price of attending private school." Opinion, ¶ 35. The Opinion contains no other support for its key holding that the Tax Credit Program is an indirect payment of tuition at private, religiously affiliated schools.
¶ 102 This is a problem. First, fiscal notes are prepared by the Governor's Office of Budget and Program Planning, an agency of the Executive Branch, not by the Legislature. Second, a fiscal note is simply the Executive's estimate of revenue and spending impacts based on a series of assumptions made by presumably affected agencies. The Court *630 relies on the Department's fiscal note assumptions to support its conclusion that the statute is facially unconstitutional because of how the agency surmised the tax credit would be used. Those assumptions reflect the Department's advocacy here-that Rule 1 was necessary to save the statute from "aiding" sectarian schools.[5] ,[6] Whether the ***493 Department's assumptions were well-researched or its predictions accurate is not the point of an inquiry into the constitutionality of the statute. They do not represent the Legislature's rationale for the statute and do not control a facial analysis of the statute's constitutionality. Third, relying on the assumption that many donors who claim the tax credit also will be parents who otherwise would be paying tuition reduces the issue to a purely as-applied challenge. It overlooks the instances in which the Tax Credit Program could constitutionally be applied.
¶ 103 Its failure to recognize constitutional applications of the statute under Article X, Section 6, undermines the Court's severability analysis, because-focusing only on Article X, Section 6, as the Court does-parts of the law would have valid application. Tax credits could be afforded for donations to private secular schools without running afoul of that section. That said, given its conclusion that the Tax Credit Program violates the prohibition against aid to religious schools, First Amendment considerations may require the Court's ultimate solution here-striking § 15-30-3111, MCA, in its entirety.
¶ 104 Quite remarkably, the Court dismisses any Free Exercise Clause concerns by proclaiming simply that "this is not one of those cases." Opinion, ¶ 40. I do not believe this issue so easily may be discarded. The Department acknowledges this as well, explaining that if the Court holds the Tax Credit Program unconstitutional, "the only way of respecting both constitutional limits on the State is to invalidate the private school tax-credit program and sever it from the remaining curricular innovation program." A State's interest "in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution [ ] is limited by the Free Exercise Clause." Trinity Lutheran , --- U.S. ----, 137 S.Ct. at 2024 (quoting Widmar v. Vincent , 454 U.S. 263, 276, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981) ). The exclusion of a group "from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution."
***494 Trinity Lutheran , --- U.S. ----, 137 S.Ct. at 2025. Only an analysis of both Article X, Section 6, and the Free Exercise Clause would eliminate all applications of the tax credits, and the Opinion offers no such analysis.
¶ 105 The Court today holds that a tax credit-granted to a private individual for a donation that may or may not be directed to a religious entity-violates the State Constitution, even though it is clear under the law that a direct tax exemption by the State to a church does not. Walz , 397 U.S. at 675, 90 S.Ct. at 1415 ; Mont. Const. art. VIII, § 5 (1)(b). As discussed above, the Delegates did not "clearly manifest" this intent in their discussions of Article X, Section 6. Nelson , ¶ 16. Although the Court does not mention them, its ruling calls into question numerous other state laws granting tax credits that may benefit religious entities, among them Montana's College Contribution Credit, § 15-30-2326, MCA, and Qualified Endowment Credit, § 15-30-2328, MCA.
*631 ¶ 106 At the end of the day, this case-like others involving the religion clauses-may be made more difficult by the circuitous path a legislative body designs in attempting to advance policy within its constitutional limits. It is in those instances that the Court's examination must be particularly precise. Tax policy is within the Legislature's wheelhouse. Tax laws "that seek to influence conduct are nothing new." Nat'l Fed'n of Indep. Bus. v. Sebelius , 567 U.S. 519, 567, 132 S.Ct. 2566, 2596, 183 L.Ed.2d 450 (2012) [hereinafter NFIB ]. Quoting Justice Joseph Story's early treatise on the United States Constitution, the NFIB Court pointed out that "the taxing power is often, very often, applied for other purposes, than revenue." NFIB , 567 U.S. at 567, 132 S.Ct. at 2596 (quoting 2 Joseph Story, Commentaries on the Constitution of the United States § 962, 434 (1833) ). The Montana Constitution does not bar the Legislature from setting tax policy to encourage any manner of private action, including incentivizing individuals to support certain philanthropic undertakings, religious or otherwise. Precisely because there is "play in the joints" between prohibited establishment and interference with free exercise, Walz , 397 U.S. at 669, 90 S.Ct. at 1412, the Court should hew closely to the constitutional text and uphold statutes unless their invalidity is established beyond a reasonable doubt. Even if "it differs from our idea of wise legislation, ... with the wisdom and policy of legislation, the courts have nothing to do." Godbe v. McCormick , 1 Mont. 105, 108 (1868) ; see also Chambers , 155 Mont. at 436-37, 472 P.2d at 1020.
¶ 107 I dissent and would affirm the District Court on the grounds discussed above.
Justice Jim Rice joins in the dissenting Opinion of Justice Baker.

The Department's position is taken from the dissenting opinion in Ariz. Christian Sch. Tuition Org. v. Winn , 563 U.S. 125, 151 n.1, 131 S.Ct. 1436, 1452, 179 L.Ed.2d 523 (2011) (Kagan, J., dissenting).

Standing alone, the title of Section 6 is not free from interpretation. It could be read, as the Court does, to proclaim that all aid to sectarian institutions is prohibited; or it could be read to preface an explanation of what aid to sectarian institutions is prohibited.

We also held in Dixon that the term "appropriation" as used in the Constitution "has reference exclusively to the general fund[.]" Dixon , 59 Mont. at 76, 195 P. at 844. This part of the Dixon holding was overruled in Board of Regents , in which this Court interpreted the 1972 Constitution as broadening the scope of legislative appropriation power, such that it "now extends beyond the general fund and encompasses all those public operating funds of state government." Bd. of Regents , 168 Mont. at 446, 543 P.2d at 1331. Therefore, Board of Regents broadened the scope of those public funds from which an appropriation may be expended. See also Treasury Fund Structure Act of 1963, 1963 Mont. Laws ch. 147, § 2. Board of Regents did not, however, alter or expand the meaning of "appropriation" provided by Dixon as "the setting apart of a portion of the public funds for a public purpose, and there must be money in the fund applicable to the designated purpose." Dixon , 59 Mont. at 78, 195 P. at 845.

"Direct" and "indirect" are "prepositive" (pre-positioned) modifiers, and the subsequent prepositional phrases are "postpositive" modifiers (positioned after what they modify). See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147-48 (2012). The nearest-reasonable-referent canon of grammatical interpretation advises that a modifier normally applies only to the nearest reasonable referent (the term to which it refers) when parts of a sentence are not grammatically parallel. Scalia & Garner, supra , at 152.

Though citing extensively from the Executive Branch Fiscal Note, the Court does not mention the 1992 Opinion from the Montana Legislature's Director of Legal Services that a proposed tax credit would not impermissibly provide an "appropriation or payment" to secular schools. He concluded that, unlike an appropriation or payment, the state would forego collecting a certain amount of tax that it otherwise would be entitled to collect, dependent upon the choices of individual parents. "The proposed tax credit would apply to a class defined without reference to religion, and any aid to religion would be the result of the private choices of individual beneficiaries." Gregory J. Petesch, Director, Legal Services, Legal Analysis of Tuition Tax Credit (Mont. 1992). The opinion is included in the record.

The Court also does not mention the Fiscal Note's assumption about enrollment at private schools resulting from the Tax Credit Program. The Fiscal Note assumes that 87 additional students would enroll in private schools in 2015, increasing to 116 new students in 2018. Fiscal Note, at 3.