DA 10-0099

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 109

IN THE MATTER OF THE ESTATE OF:
WILLIAM F. BIG SPRING, JR.,

      Deceased.

JULIE BIG SPRING and WILLIAM BIG SPRING, III,

      Appellants,

  v.

ANGELA CONWAY, DOUG ECKERSON,
and GEORGIA ECKERSON,

      Appellees.

APPEAL FROM:    District Court of the Ninth Judicial District,
                In and For the County of Glacier, Cause No. DP-04-22
                Honorable Laurie McKinnon, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Joe J. McKay (argued), Attorney at Law, Browning, Montana

      For Appellee Angela Conway:

           Ronald A. Nelson (argued), Burt Hurwitz, Church, Harris, Johnson
           & Williams, P.C., Great Falls, Montana

      For Appellee Doug Eckerson:

           Linda Hewitt Conners (argued), Attorney at Law, Kalispell, Montana

      For Amicus Curiae:

           Sandra K. Watts, Attorney at Law, Browning, Montana

Argued and Submitted:  November 10, 2010

Decided:  May 19, 2011

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      Julie Big Spring (Julie) and William F. Big Spring III (William) appeal the order of the Ninth Judicial District Court, Glacier County, denying their motion to dismiss for lack of subject matter jurisdiction.  They challenge the District Court's assumption of jurisdiction over the probate of the estate of their father, William F. Big Spring, Jr. (Big Spring), an enrolled member of the Blackfeet Tribe whose estate property was located within the exterior boundaries of the Blackfeet Indian Reservation at the time of his death.  We reverse the District Court's order and hold that the Blackfeet Tribal Court has exclusive jurisdiction over the probate of Big Spring's estate (the Estate).

¶2      Additionally, we have reevaluated the test a Montana district court must apply in determining whether it may assume subject matter jurisdiction over a dispute that arises within the exterior boundaries of an Indian reservation, which we first articulated in *State ex rel. Iron Bear v. District Court*, 162 Mont. 335, 512 P.2d 1292 (1973).  Upon review and analysis of the rationale underlying *Iron Bear*, we conclude the *Iron Bear* rationale and three-pronged test arose from a misinterpretation of controlling federal statutes and case law.  Therefore, we overrule *Iron Bear*, setting forth a revised approach premised on controlling law it its place.

**ISSUE**

¶3      A restatement of the issue on appeal is whether the District Court erred when it assumed subject matter jurisdiction over the probate of the Estate when Big Spring was an enrolled member of the Blackfeet Tribe and all of his estate property was located within the exterior boundaries of the Blackfeet Reservation at the time of his death.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Big Spring died on July 26, 2003 at the age of sixty-two. Big Spring was an enrolled member of the Blackfeet Tribe and, at the time of his death, was domiciled on the Blackfeet Indian Reservation (Reservation) in northwestern Montana. Big Spring's estate consisted of trust land and member Indian-owned fee land, all of which was located within the exterior boundaries of the Reservation. Big Spring is survived by three children, Julie, William, and Angela Conway (Angela); his ex-wife, Georgia Eckerson (Georgia); and his mother, Kathleen Big Spring (Kathleen). Georgia is the mother of Julie and William, and it is undisputed that Julie and William are enrolled members of the Blackfeet Tribe. Angela is the daughter of Big Spring and Lisa Wyrick. There are conflicting arguments as to whether Angela is an enrolled member of the Blackfeet Tribe. We deem it appropriate to our analysis to clarify Angela's enrollment status.

¶5 On appeal, Angela's counsel unequivocally state in their brief "Angela is not an enrolled member of the Blackfeet Tribe," seemingly to bolster their primary argument that this is not solely a matter of internal relations of the Blackfeet Tribe and that concurrent state court jurisdiction would not infringe on tribal self-government. This assertion, however, is at odds with numerous documents contained in the record that were submitted by Angela's counsel to the District Court, the District Court's findings of fact, and the Department of the Interior Indian probate judge's findings of fact. It appears counsel for Angela spent considerable time before the District Court providing documentation that Angela is a tribal member and daughter of Big Spring in an effort to support Angela's challenge to the probate of the Estate. It is therefore puzzling that

4

counsel for Angela now argues for the first time on appeal that Angela is not an enrolled member of the Blackfeet Tribe.

¶6 We conclude the record before us establishes that Angela is an enrolled member of the Blackfeet Tribe. First, Angela has a unique enrollment number and is identified as a member of the Blackfeet Tribe, evidenced by the Department of the Interior Indian Probate Decision, submitted with Angela's February 2, 2007 affidavit. Second, Exhibit A of the same affidavit is Angela's Descendent Form officially recognizing her as a descendent of the Blackfeet Tribe; and Exhibit C is a copy of Angela's medical records from Indian Health Services identifying her as a member of the Blackfeet Tribe. Third, in Lisa Wyrick's February 2, 2007 affidavit she states "[a]ll rights and benefits that Angela Wyrick Conway has obtained *as an enrolled member of the Blackfeet Tribe* were necessarily based on the Blackfeet Tribal Enrollment of William Forrest Big Spring, Jr." (Emphasis added.) Fourth, the District Court advised the parties during a June 13, 2007 hearing that "[Angela's] enrollment was established by the tribe as a descendant and decedent has been identified as the father of Angela Conway by the Tribe." Angela's counsel did not dispute this statement. Finally, addressing the Estate's argument earlier in these proceedings that Angela should not be determined to be Big Spring's biological daughter, the District Court concluded in its July 30, 2007 order that "[t]his issue for the Estate, however, is complicated by findings made in Blackfeet Tribal Court that Petitioner Conway is an heir and recognition of Petitioner Conway as an enrolled member of the Blackfeet Tribe." Again, Angela's counsel did not dispute this statement by the court.

5

¶7 We defer to the Blackfeet Tribal Court's determination of Angela's status because, unless limited by treaty or statute, tribes have the power to determine membership, which is a power this Court and the United States Supreme Court have recognized. *See Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327-28, 128 S. Ct. 2709, 2718 (2008); *Adams v. Morton*, 581 F.2d 1314, 1320 (9th Cir. 1978) (citing *Cherokee Intermarriage Cases*, 203 U.S. 76, 27 S. Ct. 29 (1906)); *Zempel v. Liberty*, 2006 MT 220, ¶ 20, 333 Mont. 417, 143 P.3d 123 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56, 98 S. Ct. 1670, 1675 (1978)). For the aforementioned reasons, we conclude for purposes of this appeal that the record before us establishes that Angela is an enrolled Blackfeet Tribal member.

¶8 We now turn to a recitation of the underlying facts so as to place this appeal in context. On September 29, 2004, Georgia filed an informal application to be appointed personal representative of the Estate in the Ninth Judicial District Court. In her application she represented that Julie and William were Big Spring's only heirs and that he died intestate. Simultaneously, Julie and William filed documents renouncing their priorities for appointment and nominating Georgia to be appointed personal representative. The Clerk of Court granted Georgia's application the same day. On June 1, 2006, Georgia filed her sworn statement to close the Estate and terminate her appointment as personal representative. The record indicates that between September 29, 2004 and June 1, 2006, Georgia satisfied creditors' claims, sold the Estate's only listed asset—member Indian-owned fee land near East Glacier—to Doug Eckerson (Doug), and distributed proceeds of the sale to Julie and William.

¶9     On December 1, 2006, Angela and Kathleen filed a petition in the Ninth Judicial District Court probate action for determination of testacy and heirs, challenging Georgia's handling of the Estate on numerous grounds.  Relevant to the issue of subject matter jurisdiction that is before us, the petition asserted:  (1) Georgia knew Angela was the daughter of Big Spring and intentionally excluded her from the proceedings; (2) at the time of his death, Big Spring had a valid will, executed September 15, 1965, which appointed Kathleen executrix and devised the entire Estate to her; and (3) Georgia transferred the Estate's only identified non-Indian trust asset to her ex-husband, Doug, for less than adequate consideration.  To date, extensive litigation has ensued around these issues.

¶10     To complicate matters, in the six months between the time Georgia closed the Estate and Angela and Kathleen filed their petition, the United States Department of the Interior, Bureau Office of Hearings and Appeals, held a series of probate hearings (hereinafter "DOI Probate Hearings") to settle the portion of the Estate that was Indian trust and restricted property.  On November 20, 2006, Albert Jones, the DOI Probate Hearings judge, issued his findings of facts, conclusions of law, and order.  In his decision, Jones found Big Spring's 1965 will valid and, by its terms, concluded that all of Big Spring's interest in the Estate was devised to Kathleen.  According to Jones' final decision, no one objected to the finding of a valid will or the finding that Angela was Big Spring's daughter.  During the hearings Kathleen executed a Renunciation of Interest with Retention of Life Estate.

7

¶11    The result of Kathleen's renunciation was that the Indian trust property passed as if Kathleen had predeceased Big Spring.  Kathleen retained a life estate in Big Spring's Indian trust and restricted property with the remainder divided equally among Big Spring's heirs, Julie, William, and Angela.

¶12    On August 16, 2007, the District Court held a telephonic scheduling conference in the probate action and set a trial date on Angela and Kathleen's petition for December 5, 2007.  On November 30, 2007, the District Court granted Kathleen's voluntary motion to dismiss, with prejudice, her claims regarding the petition for determination of testacy, and also granted the Estate's motion to continue the trial until March 2008.  This left Angela's petition to be resolved.

¶13    In the meantime, Doug appeared in this matter on January 28, 2008, and filed a claim against the Estate based on the administrative expenses he paid during the probate of the Estate, arguing that if the sale of the member Indian-owned fee land to him from the Estate was determined to be void, he was entitled to recover the expenses incurred in the purchase and improvement of the property.  Following Doug's appearance, Angela made an unopposed motion to continue the March 2008 trial based on the fact that Doug, Angela, and Georgia had agreed to attend an April 25, 2008 settlement agreement.  The trial was reset for May 7, 2008.

¶14    It is unclear from the record exactly what occurred between May 7, 2008 and March 10, 2009, when Doug filed a motion to enforce a settlement agreement or, in the alternative, to lift the lis pendens that had been placed on the property conveyed to him by the Estate.  Exhibit A of Doug's motion is a handwritten, undated document titled

"Settlement Terms," which on its face appears to be a list of fourteen conditions precedent to a settlement agreement among William, Julie, Doug, Georgia, and Angela. One of the conditions was that Angela's attorneys prepare the necessary documents for a settlement agreement; however, no such agreement appears in the record before us.

¶15 On April 9, 2009, the District Court ordered Angela's attorneys to prepare settlement agreement documents. On May 1, 2009, Angela filed a status report with the District Court indicating that the documents necessary to close the Estate had been circulated to counsel for the Estate, of which Georgia was personal representative, and Doug; it is unclear whether the documents were circulated to William and Julie, who at the time were unrepresented. Then, on June 3, 2009, counsel for the Estate withdrew on the grounds that Georgia had relocated and discontinued contact with counsel for "months"; the purported settlement documents, therefore, were never received by Georgia because all mail sent to her last known address was returned.

¶16 On September 16, 2009, Doug renewed his motion to lift the lis pendens from the property conveyed to him by the Estate. He argued that despite the fact that the settlement documents were never circulated to all parties, the settlement terms of the April 25, 2008 conference should be enforced. On October 6, 2009, Angela consented to Doug's motion, and stated that because Georgia, as the personal representative, had disappeared and because she could not locate Julie or William, she intended to file a motion to allow the Estate to be closed.

¶17 On October 23, 2009, for the first time since they had renounced their priority as personal representatives of the Estate in 2004, Julie and William formally appeared in

9

this probate matter with counsel, and moved the District Court pursuant to M. R. Civ. P. 12(b)(1) to dismiss the case for lack of subject matter jurisdiction. They argued the Ninth Judicial District Court lacked subject matter jurisdiction and the matter belonged in Blackfeet Tribal Court because, at the time of his death, Big Spring was an enrolled member of the Blackfeet Indian Tribe who was domiciled, and all of his property was located, within the exterior boundaries of the Reservation. Angela and Doug opposed this motion.

¶18    In a February 1, 2010 order denying Julie and William's motion to dismiss for lack of subject matter jurisdiction, the District Court defined the issue as whether the jurisdiction of the Blackfeet Tribal Court is exclusive of the district court. The court relied on our decision in *Estate of Standing Bear v. Belcourt*, 193 Mont. 174, 631 P.2d 285 (1981) for the proposition that tribal courts do not have exclusive jurisdiction over fee property on reservations. Further, while acknowledging the factual distinctions, the court cited to the 2008 United States Supreme Court case, *Plains Commerce*, for the proposition that tribes do not have plenary jurisdiction over fee property located within the exterior boundaries of their reservations because fee property is alienable. The District Court then went on to apply the three-pronged test announced in the Montana Supreme Court case, *Iron Bear*, and found that its exercise of jurisdiction over fee property within the exterior boundaries of the Reservation would not interfere with the tribe's self-government. For these reasons, the District Court concluded it had subject matter jurisdiction to probate the Estate and denied Julie and William's motion to dismiss.

¶19 Julie and William timely appeal the District Court's denial of their motion to dismiss. Angela and Doug appeared before this Court urging us to affirm the District Court. Georgia, though named as a defendant below and a respondent here, did not appear before this Court. The Blackfeet Tribe filed an amicus curiae brief arguing for exclusive tribal jurisdiction over the probate of the Estate because assumption of state jurisdiction infringes on tribal self-government. We heard oral arguments in this matter on November 10, 2010.

## STANDARD OF REVIEW

¶20 We review de novo a district court's ruling on a motion to dismiss for lack of subject matter jurisdiction. *Cooper v. Glaser*, 2010 MT 55, ¶ 6, 355 Mont. 342, 228 P.3d 443. A district court must determine whether the complaint states facts that, if true, would vest the court with subject matter jurisdiction. *Meagher v. Butte-Silver Bow City-County*, 2007 MT 129, ¶ 13, 337 Mont. 339, 160 P.3d 552. This determination by a district court is a conclusion of law that we review for correctness. *Zempel*, ¶ 11.

## DISCUSSION

¶21 *Did the District Court err when it assumed subject matter jurisdiction over the probate of the Estate when Big Spring was an enrolled member of the Blackfeet Tribe and all of his estate property was located within the exterior boundaries of the Blackfeet Reservation at the time of his death?*

¶22 The case before us concerns Montana's civil adjudicatory jurisdiction over the probate of an enrolled Blackfeet tribal member's estate, when the property of that estate is located within the exterior boundaries of the Blackfeet Reservation. While seemingly straightforward, our case law regarding civil jurisdiction over issues arising in Indian

11

Country has not been a model of clarity and, as demonstrated in this case, has caused practitioners and courts great confusion as to the appropriate analysis to undertake in such circumstances. Therefore, we address and clarify the law in this area.

**A. Julie and William's motion to dismiss for lack of subject matter jurisdiction was timely because such challenges may be raised at any time in the proceeding.**

¶23 As a preliminary matter, motions to dismiss for lack of subject matter jurisdiction may be raised at any time by any party or by the court, and once a court determines that it lacks subject matter jurisdiction, it must dismiss the action. M. R. Civ. P. 12(h)(3); *Wippert v. Blackfeet Tribe*, 260 Mont. 93, 102, 859 P.2d 420, 425 (1993). Further, it is well established that a party cannot waive or confer jurisdiction by consent when there is no basis for jurisdiction in law. *Indian Health Bd. of Billings, Inc. v. Mont. Dept. of Labor & Indus.*, 2008 MT 48, ¶ 20, 341 Mont. 411, 177 P.3d 1029 (citing *Thompson v. State*, 2007 MT 185, ¶ 28, 338 Mont. 511, 167 P.3d 867). Therefore, despite the District Court's intimation in its order that William and Julie somehow consented to the court's exercise of jurisdiction by not objecting to it earlier in the proceedings, we conclude that William and Julie have properly raised the issue of subject matter jurisdiction.

**B. The Blackfeet Tribal Court has exclusive subject matter jurisdiction over the probate of the Estate based on longstanding principles of federal Indian case law and because Montana cannot assume civil jurisdiction over the people and lands of the Blackfeet Reservation until both Montana and the Blackfeet Tribe have complied with federal statutory procedures.**

¶24 All parties cited the three-pronged test in *Iron Bear*, decided by this Court in 1973, as the appropriate test to determine whether a Montana state court has subject matter jurisdiction over the probate of a tribal member's estate located in Indian Country. The

12

issue in *Iron Bear* was whether the district court had subject matter jurisdiction over a divorce action between two enrolled members of the Assiniboine-Sioux Tribes domiciled on their reservation, the Fort Peck Indian Reservation. *Iron Bear*, 162 Mont. at 337, 512 P.2d at 1294. The *Iron Bear* Court held that the district court had jurisdiction to determine the merits of the divorce action because there was no federal legislation concerning the power to grant or deny divorces, the power to terminate a marriage contract does not interfere with tribal sovereignty or reservation self-government, and the tribal court was not exercising jurisdiction in a manner that preempted state jurisdiction. *Id*. at 345-46, 512 P.2d at 1298-99. The *Iron Bear* Court rationalized that Indians are citizens of Montana and our courts are open to all citizens, and that Montana retained residual jurisdiction over Indian reservations if the issue presented has not been specifically preempted by federal law and the state's involvement does not interfere with tribal self-government. *Id.* at 339, 343, 512 P.2d at 1295, 1297. Born of this holding was a three-pronged conjunctive test to determine whether concurrent jurisdiction exists between Montana and a tribe: (1) whether federal treaties and applicable statutes have preempted state jurisdiction; (2) whether the exercise of state jurisdiction would interfere with reservation self-government; and (3) whether the tribal court is currently exercising jurisdiction or has exercised jurisdiction in such a manner as to preempt state jurisdiction. *Id.* at 346, 512 P.2d at 1299.

¶25 Our research establishes that while the *Iron Bear* Court relied on federal case law in its analysis, it misinterpreted the applicability of those cases to reach its holding and the three-pronged test it articulated. The *Iron Bear* test is at odds with federal statutes

13

and federal case law because the test confers greater subject matter jurisdiction upon Montana state courts than is permitted by federal law.

### 1. Controlling Principles of Federal Indian Law

¶26    In the field of Indian law, federal supremacy and tribal self-government are bedrock principles.  The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  Through the Supremacy Clause of the United States Constitution, federal preemption of state law in Indian affairs has continued as the principal doctrine underlying Indian law.  *Id.* at art. VI, cl. 2.  In *Worcester v. Georgia*, the United States Supreme Court judicially recognized these bedrock principles of Indian law for the first time when it held that Georgia had no authority over non-Indians who refused to comport with Georgia law because they were residing within Cherokee tribal territory with the permission of both Cherokee and federal authorities.  *Worcester*, 31 U.S. 515, 562 (1832).  Adherence to these principles has resulted in federal treaties, executive orders, and statutes preempting state law in areas that would otherwise be covered by a state's residual jurisdiction over persons and property within the state's borders.  *See Cohen's Handbook of Federal Indian Law* §§ 2.01, 6.01[2] (Nell Jessup Newton, ed., LexisNexis 2005) (hereinafter "*Cohen's Handbook*") for a more in-depth discussion.

¶27    Furthermore, since tribal reservations are not states, and because tribes have a unique right of self-government, it is "generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas

of law." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S. Ct. 2578, 2583 (1980). The federal government has a longstanding policy of encouraging tribal self-government. This policy operates "even in areas where state control has not been affirmatively pre-empted by federal statute." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14, 107 S. Ct. 971, 975 (1987). For these reasons, the United States Supreme Court has adopted a "comprehensive pre-emption inquiry in the Indian law context which examines not only the congressional plan, but also 'the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.' " *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.,* 476 U.S. 877, 884, 106 S. Ct. 2305, 2310 (1986) (quoting *Bracker*, 448 U.S. at 145, 100 S. Ct. at 2584) (hereinafter "*Three Affiliated Tribes II*"). We adopt a similar comprehensive preemption inquiry in the context of Indian law.

¶28    When a state court is presented with an issue that invokes Indian law principles, whether regulatory (such as passing a law) or adjudicatory (such as hearing a probate case), federal precedent dictates that there are three factors that must be considered in a court's determination of subject matter jurisdiction: the status of the parties, the status of the property where the dispute arose or took place, and whether the regulatory or adjudicatory state action is criminal or civil in nature. *See generally Cohen's Handbook* at §§ 6.01-6.03.

¶29    As to the status of the parties, an individual generally may be classified as: an Indian who is either a member or nonmember of the Indian reservation in question, or a

15

non-Indian. *See Montana v. United States*, 450 U.S. 544, 563-66, 101 S. Ct. 1245, 1257-59 (1981). For consistency and clarity, we will use the terms "member Indian" to mean those Indian persons who are enrolled members of the tribe whose specific reservation is at issue; "nonmember Indian" to mean those persons who are Indians, but are not enrolled members of the specific tribe whose reservation is at issue (though they may be enrolled members of another tribe); and "non-Indian" to mean those persons who are not Indians.

¶30    The status of the property where the dispute arose or took place—be it Indian trust or restricted land, member Indian-owned fee land, nonmember Indian-owned fee land, or non-Indian-owned fee land—is a second factor. *Nevada v. Hicks*, 533 U.S. 353, 359-60, 121 S. Ct. 2304, 2309-10 (2001). The United States Supreme Court has consistently held that the Federal Government and tribes, not states, retain jurisdiction over territories defined as Indian Country in 18 U.S.C. § 1151(a), which includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 526, 118 S. Ct. 948, 952 (1998). While 18 U.S.C. § 1151 defines Indian Country for the purpose of criminal law, it is well-settled that its definition applies to civil law as well. *Id.*, 118 S. Ct. at 952 (internal citation omitted). Indian reservations are Indian Country. *Id.* at 528 n. 3, 118 S. Ct. at 953 n. 3 (internal citation omitted).

¶31    For the purposes of this appeal we address only those land statuses applicable to this case (while acknowledging there are other types of land statuses associated with

16

Indian law. *See generally Cohen's Handbook* at §§ 15-16 for an analysis of tribal and individual Indian property ownership and rights.). Individual tribal members may hold land either in the form of restricted or trust allotment, or in fee simple. *Cohen's Handbook* at § 16.03. "Allotment is a term of art in Indian law, describing either a parcel of land owned by the United States in trust for an Indian ("trust" allotment) or owned by an Indian subject to a restriction on alienation in the United States or its officials ("restricted" allotment)." *Cohen's Handbook* at § 16.03[1] (internal citations omitted). These two types of allotments are treated the same for purposes of Indian Country jurisdiction. *United States v. Ramsey*, 271 U.S. 467, 471-72, 46 S. Ct. 559, 560 (1926). If and when the trust expires or the restrictions are removed, an individual tribal member may take title to the land in fee simple absolute, which is referred to as member Indian-owned fee land. *See Cohen's Handbook* at § 16.03[4][b][i].

¶32    In a civil proceeding such as this one, nonmember-owned fee land is land located within the exterior boundaries of a reservation that is owned in fee simple by a nonmember of the tribe (either a nonmember Indian or a non-Indian). For jurisdictional purposes, member Indian-owned fee land is categorized as Indian Country when located within a reservation. 18 U.S.C. § 1151(c).[1] For purposes of this case, we consider three categories of property: Indian trust and restricted allotments, member Indian-owned fee land, and nonmember-owned fee land.

---

[1] To add to the confusion, the United States Supreme Court has used the term "trust land" in reference to trust allotments, restricted allotments, and member Indian-owned fee land, and the term "fee land" to refer to non-Indian-owned fee land. *See Cohen's Handbook* at §§ 15.03, 16.03; *e.g. Montana*, 450 U.S. at 563-66, 101 S. Ct. at 1257-58; *Plains Commerce*, 554 U.S. at 327-29, 128 S. Ct. at 2718-19.

17

¶33    The Department of Interior regulates the probate of Indian trust allotments. 25 U.S.C. § 372.  As indicated *supra* ¶ 10, the Department of Interior held a series of hearings to settle that portion of the Estate that was an Indian trust allotment.  The property at issue in the District Court probate and here on appeal is member Indian-owned fee land.

¶34    The United States Supreme Court has held that when land is involved, the status of the property may be the dispositive factor for jurisdictional purposes, *Hicks*, 533 U.S. at 360, 121 S. Ct. at 2310, and has repeatedly recognized that "tribal sovereignty is in large part geographically determined."  *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 457, 109 S. Ct. 2994, 3022 (1989); *see United States v. Mazurie*, 419 U.S. 544, 557, 95 S. Ct. 710, 717 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory."); *Bracker*, 448 U.S. at 151, 100 S. Ct. at 2587 ("The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty.").[2] In *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 96 S. Ct. 1634 (1976), the United States Supreme Court stated that tribal jurisdiction does not vary between fee lands and trust allotments as " 'such an impractical pattern of checkerboard jurisdiction' [is] contrary to the intent of existing federal statutory law of

---

[2] *See also Cohen's Handbook* at § 15.01 ("Land forms the basis for social, cultural, religious, political, and economic life for American Indian nations. . . .  Real property holdings are the single most important economic resource of most Indian tribes. . . .  Lands and resources provide opportunities for tribal economic development, providing the necessary land base for enterprises such as tourism, manufacturing, mining, logging, and other forms of resource management, and gaming.") (internal citations omitted).

Indian jurisdictional." *Moe*, 425 U.S. at 478, 96 S. Ct. at 1643-44 (internal citation omitted). Given that the United States Supreme Court has consistently guarded the authority of Indian tribes over their reservations, there is no doubt that, absent express Congressional limitations, Indian tribes maintain sovereign power over member Indian-owned fee land located within the exterior boundaries of that tribe's reservation.

## 2. Controlling Federal Indian Case Law

¶35 In *Williams v. Lee*, 358 U.S. 217, 79 S. Ct. 269 (1959), the United States Supreme Court first articulated that the test to determine if a particular state law could be applied on Indian reservations was "absent a governing Act of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams*, 358 U.S. at 220, 79 S. Ct. at 271. In *Williams*, a non-Indian who operated a general store on the Navajo Indian Reservation under a federal license filed suit in state court against a Navajo Indian and his wife, both of whom were enrolled members of the Navajo Tribe and lived on the Navajo Reservation, to collect for goods sold to them on credit. *Id.* at 217, 79 S. Ct. at 269. The Supreme Court of Arizona held Arizona courts may exercise jurisdiction over civil suits by non-Indians against Indians for actions arising on an Indian reservation because no Act of Congress expressly forbade their doing so. *Id.* at 217, 79 S. Ct. at 269. The United States Supreme Court reversed, concluding concurrent state jurisdiction was impermissible because the exercise of state jurisdiction would undermine the authority of the Navajo courts over reservation affairs and would, therefore, infringe on the rights of the Navajo to govern themselves. *Id.* at 223, 79 S. Ct. at 272. The United States

19

Supreme Court found it unpersuasive that the store owner was a non-Indian; it stated that "[h]e was on the Reservation and the transaction with an Indian took place there," and further stated that it had "consistently guarded the authority of Indian governments over their reservations," a power which is only for Congress to take away. *Id.*, 79 S. Ct. at 272.

¶36 The United States Supreme Court revisited and reaffirmed this position in *Kennerly v. Dist. Court of the Ninth Jud. Dist. of Montana*, 400 U.S. 423, 91 S. Ct. 480 (1971) (per curiam). In *Kennerly*, a non-Indian-owned grocery store in Browning, Montana, which is located within the exterior boundaries of the Blackfeet Reservation, brought suit in state court against enrolled members of the Blackfeet Indian Tribe who resided on the Reservation to collect payment for food sold on credit. The Montana Supreme Court held that state district courts had concurrent jurisdiction because a debt for groceries was not connected to Indian tribal rights and the Blackfeet Tribal Law and Order Code of 1967 conferred concurrent jurisdiction in "all suits wherein the defendant is a member of the Tribe." *Kennerly*, 400 U.S. at 424-25, 91 S. Ct. at 481. The United States Supreme Court vacated the order of the Montana Supreme Court, holding that absent affirmative legislation on the part of Montana, as required by Public Law No. 53-280, Act of August 15, 1953, 67 Stat. 588 (PL-280), and absent consent of the Blackfeet Tribe pursuant to the 1968 Indian Civil Rights Act amendments to PL-280, Montana could not assert civil jurisdiction over issues arising within the exterior boundaries of the Blackfeet Reservation. *Kennerly*, 400 U.S. at 427-29, 91 S. Ct. at 482-83; see *In re Marriage of Skillen*, 1998 MT 43, ¶ 15, 287 Mont. 399, 956 P.2d 1.

20

¶37    The Montana Supreme Court decided *Iron Bear* two years after *Kennerly* was handed down, holding that the State had concurrent jurisdiction over a divorce proceeding between enrolled tribal members who resided on the Fort Peck Reservation. Three years after *Iron Bear* was decided in Montana, the United States Supreme Court again reversed the Montana Supreme Court in *Fisher v. Dist. Court of the Sixteenth Jud. Dist. of Montana*, 424 U.S. 382, 96 S. Ct. 943 (1976) (per curiam).  In *Fisher*, the Montana Supreme Court disregarded an advisory opinion of the Appellate Court of the Northern Cheyenne Tribal Court and held that a state district court had jurisdiction over an adoption proceeding "in which all parties are members of the Tribe and residents of the Northern Cheyenne Indian Reservation."  *Fisher*, 424 U.S. at 383, 96 S. Ct. at 944. In reversing the Montana Supreme Court, the United States Supreme Court stated that "[s]tate-court jurisdiction plainly would interfere with the powers of self-government . . . [i]t would subject a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves."  *Id.* at 387, 96 S. Ct. at 947.  Germane to the case at bar, the United States Supreme Court reasoned in *Fisher* that:

> [i]n litigation between Indians and non-Indians arising out of conduct on an Indian reservation, resolution of conflicts between the jurisdiction of state and tribal courts has depended, absent a governing Act of Congress, on "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."  Since this litigation involves only Indians, at least the same standard must be met before the state courts may exercise jurisdiction.

*Fisher*, 424 U.S. at 386, 96 S. Ct. at 946 (citing *Williams*, 358 U.S. at 220, 79 S. Ct. at 271; *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S. Ct. 1267, 1270 (1973);

21

*McClanahan v. Arizona State Tax Commn.*, 411 U.S. 164, 168-73, 179-80, 93 S. Ct. 1257, 1260-63, 1266-67 (1973)).

### 3. Misinterpretation by the *Iron Bear* Court

¶38    Despite the United State Supreme Court's interpretation in *Fisher* of its decisions in *McClanahan* and *Mescalero*, the Montana Supreme Court, in *Iron Bear*, erroneously relied on *McClanahan* and *Mescalero* to bolster the assertion that states retain "residual jurisdiction" over areas that federal law has not specifically preempted and areas where tribes are not exercising jurisdiction. *Iron Bear*, 162 Mont. at 345, 512 P.2d at 1298-99. However, a careful reading of both cases reveals that neither one supports the notion of a state's retention of residual jurisdiction.

¶39    In *McClanahan*, Arizona attempted to impose its personal income tax on an enrolled Navajo member who lived within the exterior boundaries of the Navajo Reservation and whose income was wholly derived from reservation sources. *McClanahan*, 411 U.S. at 165, 93 S. Ct. at 1258. Citing to both *Kennerly* and *Williams*, the United States Supreme Court *expressly rejected the notion of residual state jurisdiction over tribes* and stated "[i]f Montana may not assume jurisdiction over the Blackfeet by simple legislation [that does not fulfill the requirements of PL-280,] even when the Tribe itself agrees to be bound by state law [but does not consent pursuant to the procedures outlined in PL-280], it surely follows that Arizona may not assume such jurisdiction in the absence of tribal agreement." *McClanahan*, 411 U.S. at 180, 93 S. Ct. at 1266-67. Thus, the *McClanahan* Court held that Arizona's tax "interfered with matters which the relevant treaty and statutes leave to the exclusive province of the Federal

22

Government and Indians themselves . . . [and] is therefore unlawful as applied to reservation Indians with income derived wholly from reservation sources." *McClanahan*, 411 U.S. at 165, 93 S. Ct. at 1258.

¶40    *Iron Bear's* reliance on *Mescalero* for the proposition that states retain "residual jurisdiction in areas where the federal law has not preempted state activity and the tribes have determined not to exercise jurisdiction" is likewise mistaken for two reasons. *Iron Bear*, 162 Mont. at 345, 512 P.2d at 1298. First, *Mescalero* is factually inapposite to *Iron Bear* because the issue presented to the United States Supreme Court in *Mescalero* was whether federal law permitted New Mexico to impose a tax on a ski resort owned and operated by the Mescalero Apache Tribe that was located on land *outside* the boundaries of the reservation. *Mescalero*, 411 U.S. at 146, 93 S. Ct. at 1269. Second, *Mescalero* reiterates that the test for application of state laws on reservations is "whether: (1) such application would interfere with reservation self-government, or (2) whether such application would impair a right [granted or reserved] by federal law." *Iron Bear*, 162 Mont. at 345, 512 P.2d at 1298; see *Mescalero*, 411 U.S. at 148, 93 S. Ct. at 1270. The case does not—as we inferred in *Iron Bear*—in any way support the notion of residual state jurisdiction.

¶41    The United States Supreme Court and this Court have recognized that the method for determining whether a state has subject matter jurisdiction continues to be the test articulated in *Williams* (*see supra* ¶ 35) which states that "[e]ssentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of the reservation Indians to make their own laws and be ruled by them." *Williams*,

23

358 U.S. at 220, 79 S. Ct. at 271; *Fisher*, 424 U.S. at 386, 96 S. Ct. at 946; *Anderson v. Engelke*, 1998 MT 24, ¶¶ 20-21, 287 Mont. 283, 954 P.2d 1106. Further, the United State Supreme Court has expressly stated that "[t]he federal policy favoring tribal self-government operates *even in areas where state control has not been affirmatively pre-empted by federal statute*." *LaPlante*, 480 U.S. at 14, 107 S. Ct. at 975 (emphasis added).

¶42 Correspondingly, both the United States Supreme Court and this Court have concluded that the *Williams* jurisdictional test for state regulatory actions is further measured by analyzing two "independent but related barriers," as set out in *Bracker*: whether the exercise of state jurisdiction or authority first may be preempted by federal law, or second, may infringe on tribal self-government. *Bracker*, 448 U.S. at 142-43, 100 S. Ct. at 2583; *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 147, 104 S. Ct. 2267, 2273-74 (1984) ("Although this Court has departed from the rigid demarcation of state and tribal authority in *Worcester v. Georgia*, 6 Pet. 515 [(1832)], the assertion of state authority over tribal reservations remains subject to 'two independent but related barriers.' ") (hereinafter "*Three Affiliated Tribes I*"); *see also Confederated Salish & Kootenai Tribes v. Clinch*, 2007 MT 63, ¶¶ 22-23, 336 Mont. 302, 158 P.3d 377; *Skillen*, ¶ 44. As the *Bracker* Court explained:

> [t]he two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad powers of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop," against which vague or ambiguous federal enactments must always be measured.

*Bracker*, 448 U.S. at 143, 100 S. Ct. at 2583 (internal citation omitted).

¶43 We acknowledge that the case before us is not a regulatory action, but instead an adjudicatory action by a state court. However, we conclude that the same two independent but related barriers articulated in *Bracker* apply in both regulatory and adjudicatory actions. First, as we noted recently in *Jud. Stds. Commn. v. Not Afraid*, 2010 MT 285, 358 Mont. 532, 245 P.3d 1116, "while state and tribal jurisdiction is complex, certain principles of tribal jurisdiction have been consistently recognized." *Not Afraid*, ¶ 10. We then went on to list the various jurisdictional tests recognizing these foundational principles, including our continued acknowledgement that "the exercise of state jurisdiction over activities occurring entirely on Indian land is an infringement on inherent tribal authority and is contrary to principles of self-government and tribal sovereignty." *Id.*, ¶¶ 10-11 (quoting *Matter of Hanna*, 2010 MT 38, ¶ 17, 355 Mont. 236, 227 P.3d 596). Second, the United States Supreme Court has applied these same principles to both regulatory and adjudicatory cases. *Compare e.g. McClanahan*, 411 U.S. at 174-75, 93 S. Ct. at 1263-64; *Mescalero*, 411 U.S. at 148, 93 S. Ct. at 1270 *with e.g. Fisher*, 424 U.S. at 387-88, 96 S. Ct. at 946-47; *Kennerly*, 400 U.S. at 426-28, 91 S. Ct. at 482-83; *Williams*, 358 U.S. at 220-23, 79 S. Ct. at 270-72.

¶44 While it is true that certain principles of tribal jurisdiction have been consistently recognized, it is also true that the jurisdictional tests we have articulated over the years have been inconsistent and, sometimes, conflicting. Notably, we previously attempted to align our case law with federal law, and specifically *Bracker*, in *First v. State, Dept. of*

25

*Soc. & Rehab. Servs., ex rel. LaRoche*, 247 Mont. 465, 471, 808 P.2d 467, 470 (1991), where we said:

> [t]he decision of the United States Supreme Court in *White Mountain Apache Tribe* [*v. Bracker*] followed our decision in *Iron Bear* by nearly seven years. In adjudicating jurisdictional matters involving Indian tribes and tribal members, the United States Supreme Court is the final authority. Therefore, the more recent test set forth in *White Mountain Apache Tribe* [*v. Bracker*] is the test to be applied, and for such reason, we are adopting this test.

However, in *First*, we did not expressly overrule *Iron Bear,* and, therefore, *Iron Bear* has continued to be cited until present day. It is time to reconcile our case law with this precedent from *First* and federal law.

¶45    We expressly overrule *Iron Bear* in its entirety for three reasons: (1) it incorrectly states the two independent but related barriers articulated in *Bracker* as part of a conjunctive test; (2) it erroneously adds a third prong ("whether the Tribal Court is currently exercising jurisdiction or has exercised jurisdiction in such a manner as to preempt state jurisdiction"); and (3) it is analytically flawed, as discussed above. Second, we expressly overrule *Skillen*, in part, for two reasons: (1) it explicitly promotes the use of the *Iron Bear* test; and (2) it draws an unnecessary distinction between jurisdictional tests for regulatory and adjudicatory cases (*see supra* ¶ 43). *Skillen*, ¶ 46 ("we hold here that *Iron Bear* and a principally sovereignty-based analysis applies in the adjudicatory context, while the *White Mountain Apache* [*Tribe v. Bracker*] preemption test shall be the starting point in a regulatory dispute.") and ¶ 47 ("Although the two tests and lines of analysis appear quite similar, they are substantially different."). Finally, in light of these conclusions, we overrule the following cases to the limited extent that they assert either

that the three-pronged test in *Iron Bear* or the adjudicatory/regulatory distinction in *Skillen* is controlling law in Montana: *Morigeau v. Gorman*, 2010 MT 36, 355 Mont. 225, 225 P.3d 1260; *Clinch*; *General Constructors, Inc. v. Chewculator, Inc.*, 2001 MT 54, 304 Mont. 319, 21 P.3d 604; *Balyeat Law, P.C. v. Pettit*, 1998 MT 252, 291 Mont. 196, 967 P.2d 398; *Krause v. Newman*, 284 Mont. 399, 943 P.2d 1328 (1997); *Lambert v. Ryozik*, 268 Mont. 219, 886 P.2d 378 (1994); *Emerson v. Boyd*, 247 Mont. 241, 805 P.2d 587 (1991); *Geiger v. Pierce*, 233 Mont. 18, 758 P.2d 279 (1988); *Milbank Mut. Ins. Co. v. Eagleman*, 218 Mont. 58, 705 P.2d 1117 (1985); *In re Marriage of Limpy*, 195 Mont. 314, 636 P.2d 266 (1981); *Estate of Standing Bear*; *State ex rel. Stewart v. Dist. Court*, 187 Mont. 209, 609 P.2d 290 (1980); *Larrivee v. Morigeau*, 184 Mont. 187, 602 P.2d 563 (1979); *Bad Horse v. Bad Horse*, 163 Mont. 445, 517 P.2d 893 (1974); and *Security State Bank v. Pierre*, 162 Mont. 298, 511 P.2d 325 (1973).

¶46    We conclude today, as we did in *First,* 247 Mont. at 470-71, 808 P.2d at 469-70, that the independent but related barriers to assumption of state authority over tribal reservations and members articulated in *Bracker* apply to both regulatory and adjudicatory cases because they encompass the foundational principles of tribal jurisdiction that have been consistently recognized in federal and Montana jurisprudence. Restated, the proper analysis in both regulatory and adjudicatory actions involving tribal members or lands is to ask whether the exercise of jurisdiction by a state court or regulatory body is preempted by federal law or, if not, whether it infringes on tribal self government.  Moreover, because the barriers are independent of one another, if either one is met a state may not assume civil jurisdiction or take regulatory action over Indian

27

people or their territories within the boundaries of their reservations. Now that we have set out the appropriate analysis, we apply it to the facts of this case.

**4. The District Court erred in assuming jurisdiction over the probate of the Estate because Public Law 280 precludes the court from assuming subject matter jurisdiction where Montana and the Blackfeet Tribe have not taken the necessary steps for Montana to assume civil jurisdiction over the Blackfeet Indian Reservation.**

¶47 The current version of Public Law 280 (PL-280) is codified at 28 U.S.C. § 1360 and 25 U.S.C. §§ 1321-26. The statute originally delegated to six states criminal and civil jurisdiction throughout Indian Country within their borders. These states were considered "mandatory states." Other states, including Montana, were "optional states" that could unilaterally "assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." *In re Marriage of Wellman*, 258 Mont. 131, 136, 852 P.2d 559, 562 (1993) (quoting Pub. L. No. 280, § 7, 67 Stat. 588, 590 (1953)). Subsequently, in 1968, Congress amended PL-280 to require the consent of the enrolled tribal members on the reservation, expressed through a majority vote of adults at a special election, before a state could assume jurisdiction over criminal or civil actions arising on a reservation and involving a tribal member. *Wellman*, 258 Mont. at 136, 852 P.2d at 562 (citing 25 U.S.C. § 1326) (hereinafter "PL-280" refers to the current statute, as amended in 1968). Similar to the Enabling Acts of other optional states upon admittance to the United States, and consistent with Article I of the Montana Constitution and the Enabling Act, 50-180, § 4(2), 25 Stat. 676, 676 (1889) ("all lands owned by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States,

continue in full force and effect until revoked by the consent of the United States and the people of Montana"), Montana codified the procedural requirements of PL-280 in Title 2, chapter 1, MCA. To date, the only tribes in Montana that have met the requirements set forth in PL-280 are the Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation. *See* §§ 2-1-301 and -306, MCA.

¶48   As we have previously recognized, Montana has not assumed jurisdiction on the Blackfeet Reservation under PL-280, and the Blackfeet Tribe has not consented to state assumption of civil jurisdiction pursuant to the procedures outlined in PL-280 and §§ 2-1-302 to -304, MCA. *Wellman*, 258 Mont. at 137, 852 P.2d at 562-63; *Agri West v. Koyama Farms, Inc.*, 281 Mont. 167, 173, 933 P.2d 808, 811-12 (1997); *Wippert*, 260 Mont. at 101, 859 P.2d at 425; *see also Fisher*, 424 U.S. at 388-89, 96 S. Ct. at 947. Significantly, the Blackfeet Tribe has rejected concurrent jurisdiction over probate proceedings of its members within the Reservation boundaries. In fact, in 1974, the Blackfeet Tribe expressly deleted any mention of concurrent state jurisdiction from the *Blackfeet Tribal Law and Order Code of 1967* (hereinafter BTLOC). BTLOC Preface § 1 (1974). Absent mutual agreement for the assumption of civil jurisdiction under this specific procedure, civil jurisdiction over "activities of non-Indians as well as Indians on reservation lands presumptively lies in the tribal court" and it is up to any party bringing an action in state court to show that state jurisdiction is not "preempted by federal statute or treaty and does not unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by those laws." *Wellman*, 258 Mont. at 137, 852 P.2d at 563

(citing *Fisher*, 424 U.S. at 382, 96 S. Ct. at 943; *Bracker*, 448 U.S. at 142, 100 S. Ct at 2583).

¶49 Julie and William assert that because Montana has not complied with the requirements of PL-280 with respect to the Blackfeet Reservation, the District Court's assumption of jurisdiction over the probate of Big Spring's estate is invalid. Angela urges that PL-280 is inapplicable in the present case and asserts that our rationale in *Iron Bear* is correct and the third prong of the *Iron Bear* test is controlling in this case. Doug does not address PL-280 in his brief.

¶50 To resolve the dispute at bar, we first consider the three critical factors discussed *supra* ¶¶ 30-32. In this case, consideration of these three factors—the status of the parties, the status of the land, and the nature of the case—place the probate of Big Spring's estate squarely on the Blackfeet Reservation and strongly tip the scales in favor of tribal sovereignty. First, all parties to the probate case are member Indians (Doug is a non-Indian, but he is an alleged creditor of the Estate, not a party to the underlying probate action). Second, Big Spring's entire estate is located in Indian Country, within the exterior boundaries of the Blackfeet Reservation. Finally, the nature of the case is a civil adjudicatory action of a private dispute. Absent express Congressional limitation, we conclude that the Blackfeet Tribe maintains sovereign power, and therefore exclusive jurisdiction, over the probate of Big Spring's estate.

¶51 Next, we apply the comprehensive preemption inquiry discussed *supra,* ¶ 27. We agree with Julie and William that PL-280 sets federal statutory requirements with which both Montana and the Blackfeet Tribe must comply before Montana can assume civil

30

jurisdiction over Blackfeet tribal members on the Blackfeet Reservation. We disagree with Angela's assertion because we conclude that *Iron Bear*'s characterization of PL-280, from which the third prong of its test is derived, is inaccurate for the reasons set forth above. Moreover, it bears noting that the two out-of-state cases relied on by the *Iron Bear* Court for the proposition that PL-280 left states with residual jurisdiction have been expressly overruled, *see Ghahate v. Bureau of Revenue*, 451 P.2d 1002 (N.M. Ct. App. 1969), *overruled by Fox v. Bureau of Revenue*, 531 P.2d 1234, 1236 (N.M. Ct. App. 1975), *Vermillion v. Spotted Elk,* 85 N.W.2d 432 (N.D. 1957), *overruled by Goureau v. Smith*, 207 N.W.2d 256, 258 (N.D. 1973), and discredited by the United States Supreme Court in *Three Affiliated Tribes II*, 476 U.S. at 877, 106 S. Ct. at 2305.

¶52    Finally, we note that the BTLOC clearly contemplates that the Blackfeet Tribal Court has exclusive jurisdiction over the probate of its members' estates. Chapter three of the BTLOC, titled "Domestic Relations," outlines how the Blackfeet Tribe shall probate Indian-owned fee land and non-trust personal property upon the death of one of its members. BTLOC ch. 3 § 4. In addition, the BTLOC states "[t]he Tribal Court may, in its discretion, turn over the question of determining heirs and distributing a decedent's property to a state court." *Id.* Here, the Blackfeet Tribal Court has made no such decision.

¶53    For these reasons, we conclude the first barrier to the assumption of state jurisdiction over member Indians on their own reservation articulated in *Bracker* is met here. The plain language of PL-280 precludes, and therefore also preempts, the District Court's assumption of subject matter jurisdiction over the probate of Big Spring's estate

31

because Montana has not assumed, and the Blackfeet Tribe has not consented to, state assumption of jurisdiction over civil probate matters of Blackfeet Tribal members' estates located on the Blackfeet Reservation. As the United States Supreme Court aptly stated in *Fisher*, assumption of state court jurisdiction would "subject a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves." *Fisher*, 424 U.S. at 387-88, 96 S. Ct. at 947. Since the barriers set forth in *Bracker* are independent, it is unnecessary to analyze this case under the second barrier (whether assumption of state jurisdiction interferes with tribal self-government) and we decline to do so.

¶54 The District Court relied on *Estate of Standing Bear* for the proposition that "an Indian may have his estate probated by the District Court despite being domiciled at the time of death within the exterior boundaries of the Blackfeet Reservation." The District Court, however, misapprehends the holding of *Estate of Standing Bear* and the factual distinctions between it and the case at bar. Crucially, while Standing Bear was an Indian who resided on the Rocky Boy's Reservation at the time of his death, he was not an enrolled member of the Chippewa-Cree Tribe of Montana; Standing Bear was an enrolled member of the Wind River Arapaho Indian Tribe of Wyoming. *Estate of Standing Bear*, 193 Mont. at 175, 631 P.2d at 286. As we have previously held, the term "Indian" is not interchangeable with "tribal member," and "the relevant distinction in a determination of inherent tribal civil jurisdiction, with respect to the status of individuals, is between tribal member and nonmember." *Zempel*, ¶ 27 (citing *Hicks*, 533 U.S. at 377, n. 2, 121 S. Ct. at 2319, n. 2). Therefore, Indians residing on an Indian reservation of a tribe other than

their own are considered nonmembers for purposes of civil jurisdiction. *Zempel*, ¶ 27. Unlike Big Spring, an enrolled member of the Blackfeet Tribe whose estate property was located within the exterior boundaries of the Blackfeet Reservation at the time of his death, Standing Bear was not an enrolled member of the Chippewa-Cree of Montana (whose reservation is the Rocky Boy's Reservation), rendering our decision in *Estate of Standing Bear* inapposite and the District Court's reliance on it in error.

¶55 Moreover, despite acknowledging that the land at issue in *Plains Commerce* was fee land held by a non-Indian, the District Court relied on *Plains Commerce* to conclude that, as a general principle, fee property—member Indian-owned, nonmember Indian-owned, and non-Indian-owned—is alienable and not subject to tribal jurisdiction. This conclusion diminishes the significance of the factual distinctions between *Plains Commerce* and the case at bar, and misapprehends the legal analysis of *Plains Commerce*.

¶56 The approximately 1,500 acres outside of East Glacier in dispute here is member Indian-owned fee land located entirely within the exterior boundaries of the Blackfeet Reservation. It is not the type of fee land that was at issue in *Plains Commerce*. *Plains Commerce* involved non-Indian fee land sold first from Kenneth Long, a non-Indian and founder of Respondent Long Company, to the Petitioner Bank, also a non-Indian, and finally to other non-Indians. *Plains Commerce*, 554 U.S. at 320-23, 128 S. Ct. at 2714-16. Here, the probate of Big Spring's estate involves only member Indian-owned fee land.

¶57    The District Court's citation to *Plains Commerce* ("Our cases have made clear that once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it." *Plains Commerce*, 554 U.S. at 328, 128 S. Ct. at 2719), does not capture the entire analysis of the *Plains Commerce* Court and misconstrues the United State Supreme Court's meaning with respect to the conversion of tribal land to fee simple land.  As the *Plains Commerce* Court explains:

> [a]ny direct harm to its political integrity that the tribe sustains as a result of fee land sale is sustained at the point the land passes from Indian to non-Indian hands.  It is at this point the tribe and its members lose the ability to use the land for their purposes.  Once the land has been sold in fee simple to non-Indians and passed beyond the tribe's immediate control, the mere resale of that land works no additional intrusion on tribal relations or self-government.  Resale, by itself, causes no additional damage.

*Plains Commerce*, 554 U.S. at 336, 128 S. Ct. at 2723-24.  Big Spring's member Indian-owned fee land is still in "Indian hands" and, therefore, has not passed beyond the tribe's control.  *Plains Commerce* is inapposite.

## CONCLUSION

¶58    In conclusion, we hold that the Blackfeet Tribal Court has exclusive jurisdiction over the probate of Big Spring's estate because at the time of his death Big Spring was an enrolled member of the Blackfeet Tribe and all of his estate property was located within the exterior boundaries of the Blackfeet Reservation.  Assumption of subject matter jurisdiction by the District Court was impermissible because Montana and the Blackfeet Tribe have not taken the necessary steps for Montana to assume civil jurisdiction over the Blackfeet Reservation.

¶59 In light of the foregoing, it will be incumbent on district courts operating in the vicinity of Indian Country to ascertain early in probate proceedings whether the case involves the probate of the estate of an enrolled tribal member whose estate property is located within the exterior boundaries of his or her own reservation at the time of his or her death. Where an action involves a member Indian and Indian Country, the court has an "independent obligation" to determine whether jurisdiction exists, even in the absence of a challenge from a party. *See Plains Commerce,* 554 U.S. at 324, 128 S. Ct. at 2716; *Stanley v. Lemire,* 2006 MT 304, ¶ 32, 334 Mont. 489, 148 P.3d 643 (citing *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S. Ct. 1235, 1244 (2006)); *Not Afraid,* ¶ 29 (Nelson, J., dissenting).

¶60 If assumption of jurisdiction of such a case is either preempted by federal law or would infringe on tribal self-government, the case must be dismissed for lack of subject matter jurisdiction. Because it had no jurisdiction, all proceedings conducted by the District Court with reference to Big Spring's estate are void.

¶61 Reversed with instruction to dismiss for lack of subject matter jurisdiction.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ JIM RICE

/S/ JOHN C. McKeon
The Honorable John C. McKeon
sitting for former Justice W. William Leaphart.

/S/ RUSSELL C. FAGG
The Honorable Russell C. Fagg
sitting for Justice James C. Nelson.