# FILED

June 19 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA



DA 12-0306

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2013 MT 166

CITIZENS FOR BALANCED USE; SEN.
RICK RIPLEY; VALLEY COUNTY
COMMISSIONERS, DUSTIN HOFELDT;
VICKI HOFELDT; KEN HANSEN; JASON
HOLT; SIERRA STONEBERG HOLT; ROSE
STONEBERG; UNITED PROPERTY
OWNERS OF MONTANA; and MISSOURI
RIVER STEWARDS,

    Plaintiffs and Appellees,

  v.

JOSEPH MAURIER; MONTANA
DEPARTMENT OF FISH, WILDLIFE &
PARKS; and MONTANA FISH, WILDLIFE
& PARKS COMMISSION,

    Defendants and Appellants,

  and

DEFENDERS OF WILDLIFE and
NATIONAL WILDLIFE FEDERATION,

    Defendant Intervenors and Appellants.

APPEAL FROM:  District Court of the Seventeenth Judicial District,
        In and For the County of Blaine, Cause No. DV-2012-1
        Honorable John C. McKeon, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Zachary C. Zipfel (argued), Rebecca Jakes Dockter (argued), Special
        Assistant Attorneys General, Helena, Montana
        (For Joseph Maurier, MT Dept. of FWP, and MT FWP Commission)

        Timothy J. Preso (argued), Earthjustice, Bozeman, Montana
        (For Defenders of Wildlife and National Wildlife Federation)

For Appellees:

    Chad E. Adams (argued), J. Daniel Hoven, Steven T. Wade, Christy S. McCann; Browning, Kaleczyc, Berry & Hoven, PC, Helena, Montana

For Amicus:

    Ryan C. Rusche, Attorney at Law, Poplar, Montana

Argued:  April 12, 2013
Submitted:  April 16, 2013
Decided:  June 19, 2013

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Joseph Maurier; Montana Department of Fish, Wildlife & Parks; Montana Fish, Wildlife & Parks Commission (hereafter referred to collectively as DFWP); Defenders of Wildlife; and National Wildlife Federation, intervenors, appeal from the District Court's Order Granting Preliminary Injunction.  We reverse.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2     This case arises from the challenges presented to the State of Montana from bison which seasonally migrate out of Yellowstone National Park.  Since 2000 the State, through the Department of Fish, Wildlife & Parks, along with the Montana Department of Livestock, has been a member of the Interagency Bison Management Plan, and it issued the Bison Management Environmental Impact Study that same year.  The United States participates in the Interagency Bison Management Plan through the National Park Service, the Forest Service, and the Department of Agriculture's Animal and Plant Health Inspection Service.

¶3     Starting in 2004 the DFWP, the National Park Service, and the USDA Animal and Plant Health Inspection Service began a quarantine program to isolate and study bison that migrated out of Yellowstone Park and into Montana.  These animals were born into the genetically-pure Yellowstone herd (not influenced by genes from domestic cattle), and were tested negative for the disease brucellosis.[1]  The goal was to create a

---

[1] Brucellosis is a serious disease for animals and humans, causing sterility and fetal abortions in livestock and undulant fever in humans. Brucellosis infects some of the Yellowstone Park bison, having been passed to them from

brucellosis-free herd that could be relocated out of the Yellowstone area, as an alternative to commercial slaughter and other bison-control measures. In 2005 DFWP established a quarantine facility just north of Yellowstone Park, starting with 100 calves that were ear-tagged, implanted with microchips, and repeatedly tested for brucellosis over a period of years. Some of these animals have matured and bred with others in the study, and their offspring have also tested negative for brucellosis.

¶4 In 2011 the DFWP considered relocation of a first group of about 60 bison for the final stage of the quarantine program, a five-year period of continued quarantine and testing. The DFWP considered several sites that could potentially pasture the animals and in September, 2011, released its draft environmental assessment evaluating the options for transferring the quarantine program bison. In December, 2011, DFWP decided to transfer the animals to an existing 4800-acre bison pasture on the Ft. Peck Reservation in northeastern Montana, and to eventually transfer half of those animals to the Ft. Belknap Reservation when a suitable pasture is established there. While there were herds of domestic bison on both reservations, the plan was to separate those animals from the Yellowstone animals and then remove the domestic animals within three years.

¶5 The final DFWP decision required it to enter agreements (referred to as a Memorandum of Understanding, or MOU) with the tribes of both reservations. The DFWP entered an MOU with the Ft. Peck Tribes on March 16, 2012, and most of the bison were transported to the Reservation on March 19, 2012. The DFWP planned that

domestic cattle. The disease can be spread back to cattle. Montana achieved designation as a brucellosis-free state in 1985 after decades of effort and expense. This designation allows cattle producers to ship animals without testing.

the agreement with the Ft. Belknap Tribes would include provisions requiring adequate new fencing prior to transferring any bison to the Ft. Belknap pasture.

¶6 On March 19, the CBU applied for a temporary restraining order against shipment of bison to Ft. Peck, but the District Court denied that application "due to procedural defects involving lack of notice and a sworn complaint or affidavit." The CBU filed a new application and the District Court granted a TRO on March 22, 2012, but only after the final shipment of bison to Ft. Peck had taken place.

¶7 The MOU with the Ft. Peck Tribes provided for the relocation and containment of the quarantine program bison. The Tribes agreed to continue the quarantine program disease testing and to be responsible for the care and management of the animals. The Tribes agreed to surround the pasture with adequate fencing, "at least a seven foot, woven wire fence." The Tribes further agreed to act within 72 hours to return any escaped bison and to maintain insurance to cover damages caused by escapes. If escaped animals are not contained they can be killed by DFWP. The agreement provided that half the animals would be transferred to Ft. Belknap as soon as practical after establishing adequate facilities there. Shipment of the bison to Ft. Peck took place primarily on March 19, 2012, with a few more animals shipped a few days later.

¶8 The present lawsuit was filed in January, 2012, challenging the DFWP action and seeking to enjoin the bison transport. The plaintiffs, collectively referred to here as the CBU, asked for an injunction to prohibit movement of any Yellowstone bison until the DFWP complied with §§ 87-1-216 and -217, MCA. While the bison transport was still in

5

process on March 22, 2012, the District Court entered a temporary restraining order enjoining any bison movement from Ft. Peck to Ft. Belknap. The District Court subsequently held a hearing and on May 8, 2012, issued a preliminary injunction prohibiting DFWP from entering any agreement with any Tribal entity or public or private landowner concerning transplanting Yellowstone bison; prohibiting DFWP from transferring any bison from the brucellosis quarantine facilities; and prohibiting DFWP from transferring any bison from Ft. Peck to Ft. Belknap. The State of Montana and intervenor defendants appeal the District Court's order granting the preliminary injunction.

## STANDARD OF REVIEW

¶9     This Court generally reviews a district court's decision to grant a preliminary injunction for a manifest abuse of discretion, one that is "obvious, evident, or unmistakable." *State v. BNSF Ry. Co.*, 2011 MT 108, ¶ 16, 360 Mont. 361, 254 P.3d 561. To the extent that a preliminary injunction is based upon an interpretation of law, the district court's conclusions of law are reviewed to determine whether they are correct. *Reier Broad. Co. v. Kramer*, 2003 MT 165, ¶ 9, 316 Mont. 301, 72 P.3d 944.

## DISCUSSION

¶10     While the Appellants state a number of issues, they all are contained within the issue of whether the District Court properly entered the preliminary injunction.

¶11     A preliminary injunction is an extraordinary remedy and should be granted with caution based in sound judicial discretion. *Troglia v. Bartoletti*, 152 Mont. 365, 370, 451

6

P.2d 106, 109 (1969). The purpose of a preliminary injunction is to preserve the status quo and to minimize the harm to the parties pending trial. *City of Whitefish v. Board of County Comm'rs.*, 2008 MT 436, ¶ 18, 347 Mont. 490, 199 P.3d 201; *Yockey v. Kearns Properties*, 2005 MT 27, ¶ 18, 326 Mont. 28, 106 P.3d 1185. The district court considering a preliminary injunction sits in equity and should not anticipate the ultimate determination of the issues in the case, *Sweet Grass Farms v. Board of County Comm'rs.*, 2000 MT 147, ¶ 38, 300 Mont. 66, 2 P.3d 825, applying § 27-19-201, MCA. The applicant for a preliminary injunction must show a prima facie case that he will suffer irreparable injury before the case can be fully litigated. *Sweet Grass Farms*, ¶ 28.

¶12 Much of the discussion in the District Court's Order Granting Preliminary Injunction, and in the arguments on appeal, arises from the application of § 87-1-216, MCA. The plaintiffs argue and the District Court concluded that § 87-1-216, MCA, governs DFWP's transfer of the quarantined bison to Ft. Peck and then to Ft. Belknap. During the injunction proceedings in District Court the plaintiffs withdrew the request that the initial group of bison be removed from Ft. Peck. A preliminary injunction is not available to restrain an act already committed. *State v. BNSF Ry.*, ¶ 19. The remaining issue in this case is whether § 87-1-216, MCA, governs transfer of some of the Ft. Peck bison to Ft. Belknap so as to support a preliminary injunction against that transfer.

¶13 Section 87-1-216, MCA, begins with a legislative finding that "significant potential exists for the spread of contagious disease to persons or livestock in Montana and for damages to person and property by wild buffalo or bison." The statute designates

7

Yellowstone National Park bison as a species requiring disease control, and designates "other wild buffalo" as a "species in need of management." Subsection (4) provides that DFWP "may not release, transplant, or allow wild buffalo or bison on any private or public land in Montana that has not been authorized for that use by the private or public landowner." Subsection (5) requires DFWP to develop and adopt a management plan before any wild buffalo "under the department's jurisdiction" may be released or transplanted onto "private or public land in Montana." The statute requires that the management plan contain a number of provisions including identification and tracking protocols, and containment measures. Subsection (6) requires DFWP to provide the opportunity for public comment and to provide a public hearing in the "affected county or counties." Subsection (7) makes the DFWP liable for the costs of any damage to private property that occurs as a result of its failure to meet any of the requirements of subsection (5).

¶14 The District Court applied § 87-1-216, MCA, and concluded that DFWP had violated the statute by transferring the bison to Ft. Peck without obtaining consent of affected landowners, and without adopting a management plan. The bison transfer to Ft. Peck had already taken place, and CBU did not seek any injunctive relief that would require removal of the Ft. Peck bison. Nonetheless, the District Court relied upon events involved in that transfer to enjoin any other transfers, including the anticipated transfer to Ft. Belknap. The District Court noted that the evidence at the hearing showed that three individuals owned some land within the designated 4800-acre pasture at Ft. Peck. There

8

was no evidence, however, that those individuals had not consented to having bison on their property, or that they objected to having bison on their property. It is uncontested that the initial 800-acre bison pasture at Ft. Belknap is exclusively tribal land.

¶15 Under the express terms of § 87-1-216, MCA, it applies only when "wild buffalo or bison" are relocated to "public or private land in Montana." A "wild buffalo or bison" is defined as a bison "that has not been reduced to captivity and is not owned by a person." Sections 81-1-101(6) and 87-2-101(1), MCA. The brucellosis quarantine bison involved in this case have been reduced to captivity for a number of years and therefore arguably are not "wild buffalo or bison" as defined in Montana law, rendering § 87-1-216, MCA, inapplicable to this case. The parties did not raise or brief this issue and it was not addressed by the District Court. Because the District Court based its ruling on an interpretation of the statute's "public or private land" language and because the parties focused upon that language in their arguments, we will consider it on appeal. *State v. Andersen-Conway*, 2007 MT 281, ¶ 14, 339 Mont. 439, 171 P.3d 678 (this Court generally does not resolve a case on grounds not raised or supported by the parties); *Pinnow v. Mont. State Fund*, 2007 MT 332, ¶ 15, 340 Mont. 217, 172 P.3d 1273 (same).

¶16 The District Court concluded that § 87-1-216, MCA, was not ambiguous and that the plain meaning of the phrase "public or private land" included transfers to tribal lands. We conclude otherwise. First, as previously noted, it is clear that the phrase "public or private land in Montana" does not expressly mention tribal lands. By contrast, in a number of other statutes the Legislature has specifically referred to tribes or tribal land

9

when it intended to do so.  Most significantly, there is a statute that expressly provides authority to the Department of Livestock to transfer bison "to qualified tribal entities" that participate in a disease control program.  Section 81-2-120(1)(d)(ii), MCA.  That statute, specifically referencing bison transfers to tribes, contains neither the landowner consent nor management plan requirements of § 87-1-216, MCA, and it requires no public hearings.

¶17    Similarly, § 87-1-217, MCA, sets out State policy on "large predators," defined to mean "bears, mountain lions and wolves."  As part of that policy, the DFWP is required to ensure that "county commissioners and tribal governments" have the opportunity for consultation on policies.[2]  Many other examples of express statutory references to tribes exist, including but not limited to: §§ 2-15-141 to 143, MCA (directing state agencies in implementing policies that "have direct tribal implications"); § 2-15-3112, MCA (livestock loss mitigation programs apply on "state, federal, and private land and on tribal land"); § 5-5-229, MCA (establishing a "state-tribal relations committee" of the Legislature); § 7-6-2230, MCA (disbursements for projects shared "with any other county, city, state, federal, or Indian tribal agency"); § 7-10-102, MCA (resources "within the exterior boundaries of an Indian reservation"); § 10-3-315, MCA (requiring authorization from any "affected political subdivision, tribal government, corporation, organization, or individual" prior to debris removal); § 60-4-202, MCA (providing for sales of property to a "federal, state, tribal, or local government"); and § 90-1-404, MCA

---

[2] The District Court in the Order Granting Preliminary Injunction determined, for reasons that are not at all clear, that bison are "large predators" under § 87-1-217, MCA.  This is clearly an error of law because the statute limits large predators to bears, mountain lions and wolves.  The parties agree that this was error.

(providing for cooperation of "state, local, private and tribal entities to develop and maintain land information").

¶18 Principles of land ownership support the conclusion that tribes and tribal lands should not be impliedly included in statutory schemes without the clearest of reasons to do so. Public lands of the State of Montana are described in Article X, § 11 of the Montana Constitution, to include lands granted by Congress, or lands acquired by gift, grant or devise, or by exchange, that are owned and managed by the State. See also § 77-1-101(8), MCA, defining "state land." Private property is property owned by an individual and therefore private. Section 70-1-102, MCA.

¶19 Reservations and tribal lands are neither public property nor private property, but are in a special class. Article I of the Montana Constitution affirms the special status of tribal lands, declaring that "all land owned or held by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States." The United States and the tribes retain jurisdiction over "Indian Country." *Big Spring v. Conway*, 2011 MT 109, ¶ 30, 360 Mont. 370, 255 P.3d 121. Nothing in these provisions on land ownership suggests that the phrase "private or public land in Montana" should be construed to include tribal lands on the reservation.

¶20 The Legislature has specifically provided for the transfer of bison to tribes in § 81-2-120, MCA, and has required DFWP to consult with tribes about large predators, § 87-1-217, MCA. We therefore conclude that the Legislature did not intend that the phrase "private or public land in Montana" include tribal lands and did not intend that § 87-1-

11

216 apply to the transfer of the quarantined Yellowstone bison to tribal lands of the Ft. Peck and Ft. Belknap Tribes.

¶21 Since § 87-1-216, MCA, does not apply to the bison transfer to Ft. Peck and Ft. Belknap, the District Court erred as a matter of law in issuing the preliminary injunction based upon the conclusion that DFWP had violated that statute.

¶22 After determining that § 87-1-216, MCA, applied to this case, the District Court applied § 27-19-201(1), MCA, and determined that the CBU had established a "prima facie case" entitling it to a preliminary injunction, to prevent the DFWP from violating § 87-1-216(4)-(6), MCA. The District Court considered whether CBU had established a likelihood of success on the merits; the likelihood of irreparable injury; whether the balance of the equities favored CBU; and whether the injunction would be adverse to the public interest. *Shammel v. Canyon Resources*, 2003 MT 372, ¶ 17, 319 Mont. 132, 82 P.3d 912 (the district court should consider those four factors where monetary damages will not afford an adequate remedy).

¶23 The District Court determined that even though the CBU failed to demonstrate the likelihood of irreparable injury in the absence of an injunction, a balancing of the equities in the case favored the CBU and therefore tipped the scales in favor of issuing an injunction. That decision was predicated upon the involvement of "disease prone" bison; the absence of a management plan required by § 87-1-216, MCA; the absence of landowner consent to the bison transfer; the DFWP's delegation of its statutory

12

responsibilities under § 87-1-216, MCA, to the Ft. Peck Tribes; and the evidence of inadequate pasture fencing at Ft. Belknap.

¶24 The CBU presented landowner testimony about the condition of some of the current fence at Ft. Belknap and about past problems of property damage caused by escaped bison from the Tribes' existing domestic herd. Property owners adjacent to the proposed Ft. Belknap bison pasture have a right, as the District Court found, to protect their property. It is at least arguable, however, that the adjacent property owners would be in a better position to do so if the DFWP bison quarantine program were completed rather than halted.

¶25 The Ft. Belknap commercial bison herd presently numbers over 400 animals. Under the plan proposed by the DFWP, the commercial herd would be separated from the quarantine bison and would be eliminated in favor of the Yellowstone animals. The projected MOU with the Ft. Belknap Tribes would be similar to the one entered with the Ft. Peck Tribes, and would require a bison enclosure fence upgraded to meet the specifications of the DFWP prior to any bison transfer. The Tribes would have specific responsibilities under the MOU to contain escaped animals, and would have to provide insurance coverage that could be claimed by adversely-affected landowners. Moreover, while the District Court referred to the quarantine bison as "disease prone," the evidence was that the animals have been tested for years and are brucellosis free, and that they will be subject to continued brucellosis testing. In fact the District Court acknowledged that there is "no evidence of a reason to believe these bison have a latent infection."

13

¶26 The District Court also failed to weigh the equities of the interest of the State of Montana in finding a way to constructively meet the challenges presented by Yellowstone Park bison which migrate into the State. The quarantine and relocation program adopted by DFWP presents a reasoned and viable alternative or addition to the hazing, confinement, commercial slaughter, and other steps that have been taken. Significantly, the clear policy of the State of Montana, enacted by the Legislature in § 81-2-120, MCA, is to permit the transfer of disease-free Yellowstone bison to Indian Tribes who will agree to have them. While the bison transfer in this case was by the DFWP and not the Department of Livestock, the animals are tested disease free and the transfer was consistent with established State policy.

¶27 Also, while the Ft. Belknap and Ft. Peck Tribes are not parties to this action, the District Court did acknowledge their interest in participating in the bison transfers. This interest is long-held and deeply rooted in the history, beliefs and traditions of the Tribes. Recovery of and reconnection to the wild genetic strain of Yellowstone bison represent important goals for the Tribes.

¶28 In summary, we cannot conclude, as the District Court did, that the balance of equities in this case favors the CBU. It was an abuse of discretion for the District Court to reach a determination on the balance of equities without fully considering the equities of all interests involved. Therefore, the District Court relied upon erroneous grounds for issuing a preliminary injunction under § 27-19-201(2), MCA.

14

¶29 Finally, the District Court determined that the CBU was entitled to an injunction under § 27-19-201(3), MCA, based primarily upon the absence of a "choice of law" provision in the MOU entered with the Ft. Peck Tribes. The District Court was concerned that the DFWP had discrete duties under § 87-1-216, MCA, that were being delegated to the Tribes. If the Tribes fell short of those duties, then neither the CBU nor the DFWP would have a forum to seek redress. This could tend "to render the judgment [of the District Court] ineffectual" as provided in § 27-19-201(3), MCA.

¶30 This discussion is relevant only to the extent that the DFWP has statutory duties under § 87-1-216, MCA, that govern transfer of the Yellowstone quarantine bison to tribal lands. As we have determined, that statute does not apply. To the extent that any statute applies, it is § 81-2-120, MCA, which lacks the requirements of § 87-1-216, MCA, and allows transfer of bison to tribes as long as disease control measures are in place.

¶31 The District Court relied upon erroneous grounds for issuing a preliminary injunction under § 27-19-201(3), MCA, and is reversed. Having determined that the preliminary injunction was wrongfully issued, we decline to address the other issues raised by the parties.

¶32 The District Court is reversed, the preliminary injunction is vacated, and this case is remanded for further proceedings consistent with this Opinion.

/S/ MIKE McGRATH

15

We concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ BRIAN MORRIS


Justice Jim Rice, concurring.

¶33     I concur in the decision of the Court.  With regard to the proper construction of § 87-1-216, MCA, any ambiguity in the statutory language was resolved during floor debate, wherein the House sponsor of SB 212 explained in response to a question that he had conferred with the Senate sponsor concerning the measure's potential impact upon transfers of bison by the Department of Fish, Wildlife and Parks to the tribes, and indicated unequivocally that the measure "would have no effect on the tribe's ability to receive buffalo from the department."  *See Montanans for Justice v. State*, 2006 MT 277, ¶ 60, 334 Mont. 237, 146 P.3d 759 ("When the legislative intent cannot be readily derived from the plain language, we review the legislative history. . . .").

¶34     The Appellants' briefing and their comments during oral argument display a remarkable befuddlement regarding the issue of jurisdiction over the MOU.  As the District Court noted, "FWP is uncertain which forum it can use to enforce the MOU."  For a department of state government to deploy state resources pursuant to a contract it has entered, while having no idea to what judicial forum it can turn to ensure that the contractual obligations made to the state will be enforced, and the state's interest

16

protected, is no less than maladministration. The obligations to the state under the MOU are substantial. As the Court notes, the Department is now working on a second MOU to be entered with the Fort Belknap Tribes. Opinion, ¶ 25. This time, perhaps some thought can be given to where the state is entitled to seek judicial enforcement of the MOU in order to protect its investment of state resources in this project.

/S/ JIM RICE